STATE of Tennessee, on relation of James Edward INMAN, a resident of Shelby County, Tennessee; and Bench and Bar, a non-profit corporation organized under the Tennessee General Corporation Act, Plaintiffs-Appellants,

v.

Ray L. BROCK, Jr., William H. D. Fones, Robert E. Cooper, Joseph W. Henry, and William J. Harbison, and Thomas H. Shriver, District Attorney General for the Tenth Judicial Circuit, Davidson County, Tennessee, Defendants-Appellees.

Supreme Court of Tennessee.

April 10, 1981.

Rehearing Denied May 20, 1981.

Certiorari Denied Oct. 19, 1981.

See 102 S.Ct. 477.

**38**

Fyke Farmer, Nashville, for plaintiffs-appellants.

C. Hayes Cooney, Chief Deputy Atty. Gen., William M. Leech, Jr. Atty. Gen., Nashville, Thomas R. Prewitt, Jr., Memphis, for defendants-appellees.

1. The parties will generally be referred to hereafter as in the trial court.

2. *Jurisdiction—Venue.—* The jurisdiction of the Court of Appeals shall be appellate only, and shall extend to all civil cases except those ... in the nature of quo warranto .... All cases within the jurisdiction thus conferred on the Court of Appeals shall, for purposes of review, be taken directly to the Court of Appeals in the division within which the case arose .... As to all other cases the exclusive right of removal and review shall be in the Supreme Court ....

## OPINION

LEWIS H. CONNER, Jr., Special Chief Justice.

This is a *quo warranto* action contesting the right of the Supreme Court of Tennessee as constituted when this suit was filed to hold that office. The case comes to this court on appeal from the decree of the Chancery Court of Davidson County sustaining the appellee-defendants'[1] motion to dismiss. Jurisdiction of the appeal in this court is by virtue of T.C.A. § 16–4–108.[2, *]

As they were party defendants in the matter, the justices of the supreme court have recused themselves. This special court was appointed by the Honorable Lamar Alexander, Governor of Tennessee, pursuant to Article 6, Section 11 of the Constitution of the State of Tennessee, to hear and finally resolve the matter.

The issues raised on this appeal are: (1) Did the attorney general for the state have the authority to represent the defendants in this action? (2) Did the chancellor err in sustaining the defendant's motion to dismiss for failure to state a claim upon which relief could be granted?

## HISTORY OF THE LITIGATION

The plaintiffs, and relators in the court below, James Edward Inman and Bench and Bar, a nonprofit corporation, brought this *quo warranto* proceeding under T.C.A. § 29–35–110 against the Chief Justice and Associate Justices[3] of the Tennessee Supreme Court alleging that they were usurping or illegally holding said office. The

* All references are to the new codification of the code though at the time this suit was filed, appealed and briefed all references were to the prior code sections.

3. After the tragic and untimely death of Mr. Justice Henry, his executors were substituted as parties defendant in this suit. Mr. Justice Drowota who replaced Mr. Justice Henry on the court is not a party to this litigation, and no relief is sought against him directly or indirectly.

plaintiffs contend that the defendants caused or procured the placing of their names on the ballots for the August 1, 1974, general election for the Tennessee Supreme Court positions as nominees of the Democratic Party in violation of T.C.A. §§ 2–13–201[4] and 2–13–203.[5] The basis for this allegation was that these gentlemen were nominated for those positions by the state Democratic Executive Committee by secret ballot contrary to T.C.A. § 2–1–113.[6] Plaintiffs contend that the defendants thereby committed a misdemeanor under T.C.A. § 2–19–102,[7] and consequently, their election was void.

The plaintiffs requested the defendant, Thomas H. Shriver, District Attorney General for Davidson County, Tennessee, to institute this suit in the name of the state. However, he refused to do so and stated his reasons in a letter dated October 23, 1979:

> I have examined your proposed quo warranto suit in the above-styled case and while I feel there may be some merit to the complaint, it would appear to me that since the members of the Supreme Court have had their names submitted for election and have been elected, the nominating process is probably not subject to attack. I therefore must respectfully decline to lend the name of the state to the action.

Plaintiff, James Edward Inman, claims a special interest in this matter, because the appellees, as members of the supreme court, denied his application for permission to appeal a matter decided adversely to him in the Western Section of the Tennessee Court of Appeals in the case of *In Re Estate of*

---

4. *Party nominations—Requirements.—*(a) No person's name may be shown on a ballot as the nominee of a political party for the office named in § 2–13–202 or for any office voted on by the voters of more than one county unless the political party:

 (1) Is a statewide political party; and

 (2) Has nominated him *substantially* in compliance with this chapter . . . . (Emphasis supplied).

5. *Methods of nomination for other offices.—*Political parties may nominate their candidates for any office other than those listed in § 2–13–202 by any method authorized under the rules of the party or by primary election under this title. Persons nominated other than by primary shall be immediately certified to the coordinator of elections by the chairperson of the nominating body. The coordinator of elections shall certify the names of the nominees to the county election commissions in each county in which the nominees are candidates by the qualifying deadlines.

If a political party decides to nominate by primary election under this section, the county executive committee shall, at least fifteen (15) days before the qualifying deadline, direct the county election commission of each county whose voters are entitled to vote to fill the office to hold the election. Primaries, if any, for nominating candidates for any office which will appear on the regular August election ballot shall be held on the first Tuesday in May before the August election.

6. *Meetings of boards and commissions.—*Boards and commissions established under this title shall meet on the call of their chairpersons or, if there is no chairperson, of the oldest member of the body in age and upon not more than fifteen (15) nor less than five (5) days' written notice to each member of the body and public notice by advertisement in a newspaper of general circulation in the county or other area represented by the body. Emergency meetings may be held on personal notice to each member of the body and on posting of five (5) public notices, one (1) at the courthouse and four (4) in public places within the county where the meeting is to be held, and on personal notice to the news editors of the news media in the county. With respect to meetings regularly scheduled by county election commissions or county primary boards, the public notice requirement of this section may be met by permanently posting in the commission office a conspicuous meeting notice. All notices shall state the time, place and purpose for which the meeting is called. All meetings of boards and commissions established under this title shall be open to the public. Official minutes of all meetings shall be kept in permanent form and shall include the vote of each member on all issues passed upon. Minutes shall be available to the public for examination at reasonable times.

A majority of the members shall constitute a quorum for any board or commission established under this title. Action shall be taken by vote of the majority of the members of the board or commission present. Any action taken at a meeting which does not meet the requirements of this section is voidable at the request of any person who is adversely affected by the action.

7. See page 46, *infra.*

*James Frank Inman, Deceased, Etc. v. Union Planters National Bank of Memphis, Etc.*, 588 S.W.2d 763 (Tenn.App.W.S.1979). *See also* 588 S.W.2d 757 (Tenn.App.W.S. 1979). In that case, the supreme court justices also denied a motion to recuse themselves filed by the plaintiff, Inman, and others at the time of that plaintiff's application for permission to appeal said case to the Tennessee Supreme Court. The other plaintiff, Bench and Bar, incorporated in 1979 by counsel for the plaintiffs, Fyke Farmer, claims a special interest entitling it to bring this suit in that it "supports the administration of justice." [8]

The defendants seasonably filed in the trial court a motion to dismiss pursuant to T.R.C.P. 12.02 on the grounds that Thomas H. Shriver, the District Attorney General, had justifiably refused to lend the name of the state to the suit; that plaintiffs lacked standing to bring the suit; that the suit was barred on the grounds of *stare decisis*; that the suit was barred by laches; and that the court lacked subject matter jurisdiction.

On December 5, 1979, the plaintiffs filed a motion to strike the acceptance of service of process for the defendants Fones, Henry, Harbison and Shriver by the Attorney General and Reporter (hereafter attorney general) for the State of Tennessee and to strike the motion to dismiss previously filed by said attorney general. Further, they requested that an alias summons issue and be served upon the defendants Brock, Fones, Henry, Harbison, Cooper and Shriver to bring them before the court.

The Honorable C. Allen High, Chancellor, heard the various motions on December 14, 1979, received an amended and supplemental complaint filed on that same date, and took the matter under advisement. Thereafter, Chancellor High filed his written memorandum opinion sustaining the defendant's motion to dismiss on all the grounds alleged therein and overruling the plaintiffs' motion to strike. An appropriate order was entered dismissing the suit. This appeal was then duly perfected by the plaintiffs.

By way of further background, in June, 1974, the defendants were nominated for election to the position of Justices of the Supreme Court of Tennessee. They were all overwhelmingly elected to that position in August of 1974. Two companion lawsuits were brought challenging the process by which the defendants were named the Democratic nominees for election to the Tennessee Supreme Court and specifically contesting the election of Mr. Justice William H. D. Fones. Fyke Farmer, the attorney for the plaintiffs herein, was counsel for the plaintiffs in both of those suits. In each case, Robert L. Taylor, a dissatisfied and losing candidate for nomination before the Tennessee State Democratic Executive Committee, brought suit against the Tennessee State Democratic Executive Committee and Mr. Justice Fones, the successful candidate before that committee. Both suits allege the same basic facts. The first suit was filed in the Chancery Court of Davidson County on July 26, 1974, before the general election and sought to have the nomination of the said William H. D. Fones as a Democratic candidate for justice of the supreme court declared null and void. The complaint initially alleged that the nomination of defendant Fones had been obtained by means of a fraudulent conspiracy among certain unnamed persons, some of whom were members of the Tennessee State Democratic Executive Committee. That complaint was later amended to allege that under the rules of the state Democratic Party, the Democratic Executive Committee had no power to nominate candidates for justice of the state supreme court and that the nomination of defendant Fones by said committee was void.

The second lawsuit in that series was filed in the Chancery Court of Shelby County on August 12, 1974, eleven days after defendant Fones was elected by the popular vote of the citizens of Tennessee to the judicial office for which he had been nominated. The complaint, as amended, alleged the same facts and circumstances as those

---

**8.** See p. 46, *infra*, for a more particular description of "Bench and Bar" and its purpose.

of the Davidson County suit, stating, however, that it was brought pursuant to T.C.A. § 2–17–101 as an "election contest." Motions to dismiss which were filed by the defendants in both suits were subsequently granted by the chancellors, and the plaintiffs appealed from those adverse rulings.

In both those cases, plaintiffs' attack was directed toward the nomination, not the election of the defendant Fones. Both of those lawsuits contested the right of the Democratic Executive Committee to select the party nominees for Justice of the Supreme Court of Tennessee.

The cases were consolidated on appeal with the supreme court recusing itself and a special supreme court being appointed. The court, in clear and unmistakable terms, held against the plaintiffs on two basic grounds. First, the court determined that the chancery courts of Tennessee did not have subject matter jurisdiction, there being no right to contest in the courts the method used by a political party to select its nominee for office. The court held that there was provision for election contests, not nomination contests. *See Taylor v. Tennessee State Democratic Executive Committee,* 574 S.W.2d 716, 717 (Tenn. 1978).[9] The court went on to say that the complaining party in that case was not without a remedy; but, the remedy was to appeal and to contest the nomination with the state primary board of the Democratic Party—however, not with the chancery court.

The *Taylor* court further held that the plaintiff was guilty of laches, because he took no action for eight weeks following Fones' nomination, "while the nominee, the Democratic Party, and the entire election machinery of the state prepared for the general election. Plaintiff, by his own conduct, created a situation where the doctrine of laches would apply." 574 S.W.2d at 718.

## REPRESENTATION OF THE APPELLEES BY THE ATTORNEY GENERAL

 The chancellor held that the Attorney General for the State of Tennessee is

given very broad discretion to decide what matters may be of interest to the people generally and that the state certainly has an interest in the outcome of a suit involving matters such as were present in the instant case. Here, the suit was filed alleging wrongdoing against all of the justices, in part because of actions taken in the course of their official business, e. g., acting improperly in the *Inman* suit, *supra.* The additional allegations of wrongdoing address the circumstances of the court's election.

This court is of the opinion that the chancellor was correct in his ruling in the matter. In the case of *Heath v. Cornelius,* 511 S.W.2d 683 (Tenn.1974), the plaintiff contended that the attorney general had no authority to represent a state criminal court trial judge in a civil suit for actions arising out of his official duties. The supreme court found this contention without merit and quoted with approval from *Mundy v. McDonald,* 216 Mich. 444, 185 N.W. 877, 880 (1921) as follows:

A broad discretion is vested in this officer in determining what matters may, or may not, be of interest to the people generally. We must recognize the fact that the office of Attorney General is ancient in its origin in history, and it is generally held by the states of the Union that the Attorney General has a wide range of powers at common law. These are in addition to his statutory powers.

T.C.A. § 8–6–109 provides in pertinent part as follows:

. . . (b) In addition to the duties described in subsection (a) of this section, the attorney general and reporter or his assistants acting at his discretion, shall have the following duties: . . .

(1) The trial and direction of all civil litigated matters and administrative proceedings in which the state of Tennessee or any officer, department, agency, board, commission or instrumentality of the state may be interested; . . .

---

**9.** For the precise holding from *Taylor, supra* see page 43, *infra.*

The statute is very broad in both its specific language and intent. The legislature has undoubtedly vested the attorney general with a broad discretion to decide when he may lend the assistance of his office to defend public officers. Under the facts presented, this court is of the opinion that the attorney general acted properly in representing the defendants herein. For the attorney general to have done otherwise would have been improper in view of the fact that this lawsuit presents the third occasion that the identical issues heretofore resolved in *Taylor, supra,* have been raised.[10]

## DOES THE COMPLAINT STATE A CAUSE OF ACTION UPON WHICH RELIEF MAY BE GRANTED?

Having resolved the question of the appropriateness of the attorney general's representation of the defendants, we now turn to the substantive ruling of the trial court that the amended complaint filed herein should be dismissed for failure to state a cause of action.

We are of the opinion that the action of the learned chancellor was correct in deciding that the complaint failed to state a cause of action upon which relief could be granted. The four bases for the court's holding are discussed hereafter.

## I. LACK OF SUBJECT MATTER JURISDICTION

■ Plaintiffs urge that the provisions of T.C.A. § 2–13–201 requiring substantial compliance with the election code and T.C.A. § 2–13–203, providing that political parties may nominate their candidate by any method authorized by party rules or by primary election, renders the chancery court a forum for party members to challenge alleged misconduct in making party nominations. We expressly reject that contention.

Courts of equity are conversant only with matters of property and the maintenance of civil rights, and *in the absence of stat-*

utory authority will not interfere to enforce or protect purely political rights. Accordingly, a court of equity ordinarily will not undertake by injunction or otherwise to supervise the acts and management of a political party for the protection of purely political rights when no rights of property are involved. *The rule that courts of equity are without jurisdiction to enforce purely political rights is particularly applicable in all questions involving the irregularity of party organization and in matters involving nominations of party candidates where the nominations are held under rules and regulations promulgated by the party organization and are not governed by any statutory proceedings....* 25 AM.JUR.2d *Election* § 127 (1966). (Emphasis supplied).

■ Further, the election code read in its entirety indicates that T.C.A. § 2–13–203 is to be read permissively. T.C.A. § 2–1–102 plainly states that the election code is to "regulate the conduct of all elections by the people." T.C.A. § 2–1–104(6) defines elections as including general elections, primary elections and submission of questions to the people by a ballot—*not* the method of selecting nominees by the Tennessee State Democratic Executive Committee. It is argued by the plaintiffs that the State Executive Committee actions are regulated by the code and that the State Executive Committee, in selecting by secret ballot the nominees now challenged, violated the sunshine law, T.C.A. § 2–1–113. We expressly reject this contention.

■ A clear indication of the legislative intent to keep the courts and the public sector out of intra-party actions, reactions and squabbles is T.C.A. § 2–17–104, which provides that challenges to primary elections are to be settled within the party structure. And in the case of *Heiskell v. Ledgerwood,* 144 Tenn. 666, 234 S.W. 1001 (1921), the court held in clear and unmistakable terms that party determinations are

---

10. Prior to this suit counsel for the plaintiffs herein filed two separate suits in the Chancery Courts of Davidson and Shelby Counties re-

spectively which were jointly heard in *Taylor v. Tennessee State Democratic Executive Committee, supra.*

conclusive on the courts. If the party structure is to make the final determination in matters of primary elections, even though expressly regulated by the code,[11] it would stretch the imagination to conclude that nominations otherwise made and unregulated are to be determined by the courts. Allowing these disputes to be settled by the party, prior to the elections, assures the electorate that the candidate, once fairly and honestly elected, will not be prevented from serving because of challenges to the pre-election nomination process.

And if the previously existing law were not clear enough on the subject, one has only to read the express holding of a previous case on this matter, *Taylor v. Tennessee State Democratic Executive Committee, supra,* wherein it was held that:

> *The chancery courts of this state do not have jurisdiction of this subject matter.* At common law there existed no right to contest in the courts the title to nomination of a political party for office; and therefore no such right exists unless specifically provided by statute. . . . There is no such statute in this state. T.C.A. § 2–1701 confers exclusive jurisdiction on the chancery courts for election contests, *not nomination contests.* 574 S.W.2d at 717. (Emphasis supplied).

No holding on the subject could be more clear, lucid, definitive or final. The chancellor was correct in dismissing this suit for lack of subject matter jurisdiction.

The courts throughout this land seem uniformly to be concerned about the expression of the will of the majority of the electors, a full, fair and free expression of the public will, and, of course, the consideration that the successful candidate is otherwise qualified to hold office. *See Moore v. State,* 37 Tenn. 510 (5 Sneed 1858). In *Browning v.*

*Gray,* 137 Tenn. 70, 191 S.W. 525, 526 (1917), the Tennessee courts for the first time many years ago established the general proposition that:

> Courts are properly very slow to interfere with the declared result of an election unless there are specific charges of fraud directed against named voters sufficient in number to change the result. This rule is supported by a sound public policy grounded in a due regard for the peace and order of society and the stability of governments. If the will of a majority of the legal and qualified voters has been ascertained, although irregularly ascertained, it would be bootless to order another election to accomplish the same purpose. *Id.* 191 S.W. at 526.

In *Summitt v. Russell,* 199 Tenn. 174, 285 S.W.2d 137 (1955), it is noted that a mere irregularity doing no injury to voters or candidates will not invalidate an election. The contrary rule would defeat the will of the majority. *McCraw v. Harralson,* 44 Tenn. 34 (4 Cold. 1867), discusses the objective of a statute relating to election inspectors and says that strict conformity is not required, because "it would result in interminable contests about unsubstantial formalities, and end in a practical denial of the right of the people to choose their own officers." That case also holds to avoid an election for a technicality in choosing inspectors "would lead to defeat, rather than uphold, popular elections, and cannot be maintained." It was well stated in *Barry v. Lauck,* 45 Tenn. 588 (5 Cold. 1868), that to set aside an election, the alleged wrong must be "so gross and palpable a failure of opportunity for a free and equal expression of the popular will, that the election cannot be permitted to stand." *See also Hanover v. Boyd,* 173 Tenn. 426, 121 S.W.2d 120 (1938) where an "immaterial official over-

---

**11.** *Contest of primary election.*—Any candidate may contest the primary election of his party for the office for which he was a candidate. To institute a contest he shall, within five (5) days after the certification of results by the county election commission, file a written notice of contest with the state primary board of his party and with all other candidates who might be adversely affected by the contest. In the notice he shall state fully the grounds of the contest. The state primary board shall hear and determine the contest and make the disposition of the contest which justice and fairness require, including setting aside the election if necessary.

sight" was not permitted to interfere with the express will of the voters.

## II. THE ACTION IS BARRED BY *STARE DECISIS*

■ The court below held that *Taylor v. Tennessee State Democratic Executive Committee, supra,* barred this suit on the basis of *stare decisis.* While the parties were different in the *Taylor* case the issues raised were in substance the same. *Taylor v. Tennessee State Democratic Executive Committee, supra,* is the law of this case. It is the rule in this state that party squabbles and disputes will be decided through the machinery of those political parties, not the courts. Counsel for the plaintiffs should know this rule better than any living person, because he was counsel in both the consolidated cases that became *Taylor v. Tennessee State Democratic Executive Committee,* 574 S.W.2d 716 (Tenn.1978).

## III. THE DISTRICT ATTORNEY GENERAL'S REFUSAL TO AUTHORIZE THIS ACTION WAS JUSTIFIED; CONSEQUENTLY, THIS IS NOT A PROPER *QUO WARRANTO* PROCEEDING

■ The law is clear in Tennessee that a private citizen may not institute a proceeding to have an election declared void on any ground. This principle was first alluded to by the distinguished Mr. Chief Justice Neil in the case of *Skelton v. Barnett,* 190 Tenn. 70, 227 S.W.2d 774, 775 (1950) when he said:

> There is no case in the books so far as we have been able to find wherein an individual citizen is permitted to file a bill seeking to have an election declared void upon any ground. Since the complainant in the instant case seeks no relief whatever for himself, he is not permitted to challenge the result of the election solely upon the grounds that he seeks to redress a public wrong.

■ Thereafter, in *Walker v. Sliger,* 218 Tenn. 657, 405 S.W.2d 471 (1966) the court in reliance on Mr. Justice Neil's language in *Skelton v. Barnett, supra,* reaffirmed the principle that an individual citizen is not permitted to file a complaint seeking to have an election declared void upon any grounds. The rule is essentially that a private citizen, as such, cannot maintain an action complaining of wrongful acts of public officials unless such private citizen avers special interest or a special injury not common to the public generally. *See generally Patton v. Mayor, Etc., City of Chattanooga,* 108 Tenn. 197, 65 S.W. 414 (1901); *Walldorf v. City of Chattanooga,* 192 Tenn. 86, 237 S.W.2d 939 (1951); and *Bennett v. Stutts,* 521 S.W.2d 575 (Tenn.1975).

In *Bennett v. Stutts, supra,* the court reaffirmed the rule prohibiting private citizens from commencing a *quo warranto* action to rectify a public wrong. However, in *dicta* it was indicated that there was a requirement that the trial judge conduct an *in limine* hearing for the purpose of determining whether or not the attorney general had arbitrarily refused to lend his name and that of the state for the benefit of relators. No other Tennessee authority has been found or cited for this proposition. The *in limine* hearing conceived in *Bennett v. Stutts, supra,* is designed to determine whether or not to permit the plaintiffs to proceed. The trial court must determine whether the attorney general, in refusing to act, has done so arbitrarily or capriciously or in declining to bring such action has been guilty of palpable abuse of his discretion. It must be noted that the court in *Bennett v. Stutts, supra,* after making the above pronouncement, ruled that the plaintiffs in that case were correct in their insistence that the county officers being attacked were not elected in accordance with the provisions of the Tennessee Code. Nevertheless, the court held that they did not have standing to bring the suit.

■ Even with the *Bennett v. Stutts* exception to the general rule, the trial judge would have to find that the district attorney general's refusal to bring the suit or authorize its institution was a palpable abuse of his discretion. Since *Taylor v. Tennessee State Democratic Executive Committee, supra,* had been previously decided, reasonable minds could not differ

with the proposition that the district attorney general is absolutely shielded by that authority. The court in *Taylor, supra,* specifically held that the chancery court did not have jurisdiction to entertain a suit contesting title of the nominee of a political party to the office sought. This suit contests precisely that question. The district attorney general had every right, and indeed a duty, to rely upon the *Taylor* case as legal precedent in opposition to the request being made by the plaintiffs. Conversely, had the district attorney general brought a *quo warranto* suit in the face of the *Taylor* decision, he might well have been guilty of an abuse of the powers of his office. We think he acted with absolute propriety and that the court below quite properly sustained his actions.

The plaintiffs have alleged special injury in this matter upon which they predicate their right to sue. The plaintiff James Edward Inman purports to have a special interest because the supreme court is alleged to have arbitrarily and wrongfully refused to hear his appeal. Giving him the benefit of the gravest doubt and assuming solely for purposes of argument that the nomination of these parties was, in fact, irregular prior to their election, they nevertheless received a clear majority of the vote. They have, since the date of their election in 1974, assumed the duties of the office and have carried out its functions. They are at a minimum, *de facto* the Supreme Court of the State of Tennessee under any possible construction. The acts of a *de facto* officer are binding upon the public at large; therefore, Mr. Inman does not have a special interest which would set him apart from the said public at large so as to give him standing to sue. *See Country Club, Inc. v. City of Knoxville,* 217 Tenn. 104, 395 S.W.2d 789, 793 (1965).

To allow an unsuccessful litigant to make the claim of special standing solely because he was unsuccessful would be potentially destructive of the judicial system. This we will not allow.

## IV. THE DOCTRINE OF LACHES APPLIES

In the *Taylor* case it was clearly held that the delay by the unsuccessful candidate in the Democratic Party Executive Committee struggle, who waited eight weeks before taking legal action, was sufficient to invoke the doctrine of laches when, during the eight weeks, "the nominee, the Democratic Party and the entire election machinery of the state prepared for the general election." Here there is a delay of five years from the action complained of before suit is brought. Having concluded that plaintiff Inman is without sufficient special interest, or standing to sue, as an unsuccessful litigant, we find further that his five-year delay in bringing this action subjects the action to the same bar of laches as that applied in the *Taylor* court.

Plaintiff Bench and Bar, which did not exist at the time of the contested nomination, may not escape the bar of laches merely by reason of being founded several years subsequent to that event. Furthermore, that entity's self-proclaimed purpose, "to aid and strengthen the administration of justice ..." does not create for it a special or peculiar interest; on the contrary, its interest is entirely consistent with that of the public at large. We, therefore, conclude that its appeal must be disposed of in the same manner as that of plaintiff Inman.

## ALLEGED VIOLATION OF TENNESSEE CODE ANNOTATED § 2–19–102

Plaintiffs contend that the defendants were disqualified from serving, because defendants violated certain sections of the Tennessee Election Code. Plaintiffs state:

The five individual defendants caused or procured the placing of their names on the ballots in the August 1, 1974 general election as nominees of the Democratic Party for judges of the Supreme Court contrary to and in violation of the "Election Code" and particularly *T.C.A.* 2–1301[12] *and* 1315[13] in that they were not nominated by any method authorized by

---

12. T.C.A. § 2–13–201 as recodified.

13. T.C.A. § 2–13–203 as recodified.

the Rules of the Party or by primary election but by the State Democratic Executive Committee, which assumed the authority wrongfully to make nomination for judges of the Supreme Court at a meeting of the committee held on June 1, 1974, voting by secret ballot contrary to the provisions of *T.C.A. 2–113*[14] requiring that official minutes be kept so as to include the vote of each member on all issues passed upon. As the said defendants knowingly allowed their names to be shown on the ballot as nominees of the Democratic Party for judges of the Supreme Court, they did an act prohibited by the Election Code and committed a misdemeanor under *T.C.A. 2–1902.*[15]

Brief on Behalf of Appellant pp. 3–4.

T.C.A. § 2–19–102 reads as follows:

*Commission of prohibited act or omission of duty.*—A person commits a misdemeanor if he knowingly does any act prohibited by this title or if he knowingly fails to do any act which he is required to do by this title or if he knowingly does any act with the intent that another shall do an act prohibited by this title.

Although from a strictly legal standpoint, our disposition of the issues previously discussed makes it unnecessary for us to reach the instant question, we believe it advisable to do so. We intend no possible misconstruction of our meaning by anyone, and we intend to address any question that might possibly leave a cloud over the heads of the justices whose entitlement to office is attacked in this proceeding. This is particularly so in light of the fact that the complaint alleges violations of the criminal law.

 Inasmuch as a violation of T.C.A. § 2–19–102 constitutes a violation of the election title, a misdemeanor, as opposed to civil infractions, that statute must be interpreted with the same severity as applied to other criminal statutes. Therefore, a strict interpretation is required. In this connection a leading treatise teaches that:

Criminal statutes must be strictly interpreted, both with respect to the act charged as the offense and the penalty imposed. It is axiomatic that statutes creating and defining crimes cannot be extended by intendment. Before a man can be punished, his case must be plainly and unmistakably within a statute. As liberty and perhaps life are involved, every reasonable doubt must be resolved in favor of the defendant. 1 WHARTON'S CRIMINAL LAW AND PROCEDURE § 19 (12 Ed. 1957).

 Based on the foregoing premise and construing the allegations relating to T.C.A. § 2–19–102 in a light most favorable to plaintiffs, we conclude that no violation of that statute can possibly be substantiated. Plaintiffs, at most, argue that defendants violated the Election Code by failing to police their party's nomination process. T.C.A. § 2–19–102 does not actually spell out any prohibited conduct, but only refers to "acts prohibited by this title." Consequently, as a matter of statutory construction it is impossible for us to find the justices disqualified on the basis of a violation of that statute standing alone. Furthermore, even if some strained interpretation were to permit us to find a violation of T.C.A. § 2–19–102, the culpable party would have to be the Democratic Party and not the nominees. Nowhere in T.C.A. § 2–19–102, or the title to which it refers is there any language imposing upon nominees the burden of policing a party's nominating processes. In order for this court to sanction the imposition of such a requirement—the violation of which would constitute an infraction of the criminal law—we would first have to conclude that the high decree of certainty required in criminal laws, *Werner v. City of Knoxville*, 161 F.Supp. 9 (E.D.Tenn.1958), that would permit a finding of a violation proscribed by T.C.A. § 2–19–102, is present therein. This we cannot do. We hold that plaintiffs have failed to state a violation under T.C.A. § 2–19–102 and accordingly the allegation that defendants are disqualified by virtue

14. T.C.A. § 2–1–113 as recodified.

15. T.C.A. § 2–19–102 as recodified.

of having violated said statute must also fail.

The members of the existing supreme court who took office in 1974, were nominated in substantial compliance with existing law (at a minimum) and duly elected by the voters of this state in an election, the propriety or regularity of which has not been attacked in this litigation.

In the last analysis there can be no further challenge to the present supreme court based on the 1974 actions of the Executive Committee of the Tennessee Democratic Party. The members of the court who took office in 1974 are *de jure.* They have always been *de jure.* Under the long established principles of *stare decisis* there can be no further attack on the court as constituted based upon the nomination or election process.

### THE ACTIONS OF COUNSEL FOR PLAINTIFFS

In the same vein, counsel for the defendants has raised serious questions in regard to the propriety of the actions of counsel for the plaintiffs in this matter and this court believes it has a duty to the bench, the bar and in the proper administration of justice to address those questions and ultimately to address the actions of counsel for the plaintiffs.

The defendants allege that there was "no conceivable legal basis for this suit or this appeal." It is the third suit filed in which the same attorney has attacked the validity of the existing supreme court on essentially the same basis.

Defendants also urge that plaintiffs' pleadings and briefs are disrespectful and contain harsh and improper allegations.

Has counsel for the plaintiffs been abusive of the judicial system in that he has filed scandalous and impertinent pleadings and briefs?

Scandalous matter is defined as:

Defamatory reports or rumors; aspersion or slanderous talk, uttered recklessly or maliciously.

Black's Law Dictionary 1206 (5th ed. 1979).

Impertinence is defined by Black as:

Irrelevancy; the fault of not properly pertaining to the issue or proceeding. That which does not belong to a pleading, interrogatory or other proceeding; out of place; superfluous; irrelevant. A term applied to matter not necessary to constitute the cause of action or ground of defense.

*Id.* at 679.

The briefs of the plaintiffs are replete with material we find to be scandalous and impertinent. Examples follow.

In the original complaint counsel for plaintiffs and the sole organizer of Bench and Bar alleges:

Relator BENCH AND BAR is a non-profit corporation organized under the Tennessee General Corporation Act, for the following purposes: To aid and strengthen the administration of justice by inculcating and encouraging a fearless respect for and appreciation of plain truth and simple honesty; *to endeavor to make hatred of all common law fraud a principle of adjudication of controversies in the civil courts*; to promote and support endeavors to bring about practical and salutary application of the cliché, "Ours is a government of laws and not of men"; *and to devise means for opening the channels of communication between the courts and the public to enable the people to perceive that justice is being done.* BENCH AND BAR has, therefore, a special and peculiar interest which entitles it to join as relator in this action. (Emphasis supplied).

In the motion to recuse in the supreme court in the case of *Union Planters National Bank of Memphis v. Inman,* counsel, in complaining about the decision of the Western Section, inferred some apparent wrongful conduct to the distinguished Judge M. Watkins Ewell, Jr., now deceased. Judge Ewell was a member of the special supreme court appointed by the Governor in the *Taylor* cases and sat as a member of the Western Section of the Court of Appeals of Tennessee at the time of the *Inman* appeal.

That motion to recuse filed by counsel herein alleges that:

The petitioners in their application for permission to appeal the decision of the court of appeals in this case contend *that the decision is based upon findings and conclusions of the court of appeals which are the result of a garbling and falsification of the record.*

In the amended complaint filed herein and in the briefs of the plaintiff, the existing Supreme Court of the State of Tennessee was repeatedly referred to as a "spurious court."

Further, in the amended complaint filed by counsel wherein concern is registered about the action of the supreme court in not overturning the appeal of *Inman* in reference to the "spurious court" the allegation is made that:

Its approval of the judgment of the Court of Appeals cannot be ascribed to inadvertence. Palpably, it was due to partiality to the draftsmen of the will and a bias against the attorney for contestants who was questioning the authority of the sitting judges on constitutional grounds to determine the appeal.

In his brief counsel for the plaintiffs alleges a falsification by the *Taylor* special supreme court of a portion of T.C.A. § 2–13–102. The following is quoted from that brief filed with this court:

Another reason required the falsification. The opinion gave as a reason why the chancery court had no jurisdiction, that the disappointed candidate had a *statutory* right (just where such a provision is to be found and the statute was, of course, not disclosed) to contest the nomination, but it was before the State Primary Board of the Democratic Party, not the chancery courts. So, after this shameful revamping of the statute, the Special Court concluded: . . . .

Further, the brief of counsel states:

Need it be said that the good faith and integrity of the special panel is severely impugned by their deliberate and artful misrepresentation of the statute? Few lawyers, without laying the statute along

side the opinion and comparing them, as we have done here, would had discovered the subreption.

And further:

The decision of the Special panel on the factitious case made by it is no determination of the real issue now before the Court the second time.

In the *amicus curiae* brief of counsel in his own name which was filed only two days before oral argument in this cause, the attorney for plaintiffs abuses the lawful and properly constituted supreme court on a matter totally unrelated to any of the issues before this court. That matter was whether the creation of the disciplinary board and the requirement of an annual license fee for all practicing attorneys for disciplinary purposes is legal. That question had absolutely no relevancy to the instant litigation.

Throughout this document the supreme court (and the entire judicial system) was belittled, and demeaned. As an example, on page 6 the document states:

In 1975 the spurious supreme court had the effrontery to create another inferior court which it called the Disciplinary Board of the Supreme Court thereby making it a subagent to discipline attorneys.

Further, in the same document concerning his complaint because of the filing of disciplinary proceedings against him counsel wrote:

Immediately after the filing of the Amended and Supplemental Complaint in the case in the chancery court—all of the allegations of fact being admitted by the defendants—they (or one member) of the court secretly and surreptiously (sic) instigated proceedings against the undersigned before the Disciplinary Board based on the very same allegations of fact that by their motion to dismiss in the chancery court below they had admitted were true. This was done personally and not officially. *They used Thomas A. Shriver, Presiding Judge in the Court of Appeals, as a front or catspaw in an*

*underhanded and diabolical plot to bring odium on him because he had brought out the truth about the matters pertinent to the cause of action he was pursuing for his clients.* (Emphasis supplied).

Finally, on page 9 of this *amicus curiae* brief of counsel for plaintiffs, and in reference to his belief that the creation of the disciplinary board was improper, counsel stated that:

> The defendants rely heavily on the doctrine of inherent powers for their authority to create the Disciplinary Board. It is to be presumed, we suppose, that they contend that this power is to be found somewhere in the Constitution; otherwise this power would be extra-constitutional. We have shown that such a concept is prohibited by the express words of the Constitution. So, they must be driven to the assertion that it lurks somewhere in the secret recesses of the Constitution, like the "unwritten law" formerly sometimes invoked. We believe that it will not be far-fetched to trace the origin of the doctrine to Louis XIV of France, who in the seventeenth century is reported to have justified the arbitrary power he exercised by the dogmatism, "L'Etat, C'est Moi," "I am the State."

■ This court holds the express statements of counsel for the plaintiffs to be of the most reprehensible nature and statements that are clearly scandalous and impertinent. Irrespective of whether members of the bar ever agree with the decision of the supreme court or any other court of this state or this nation they are obliged to treat those bodies with respect and reason and should follow at least minimum standards of decent and reasonable human conduct.

Having represented the clear loser as to this question in two other separate lawsuits which found their way to the supreme court and which were heard by impartial tribunals below and at the supreme court level, counsel for the plaintiffs has tried to get in the barn by the back door, because the front door and the side door had been locked.

In the pleadings before this court he has impugned the integrity of the existing Supreme Court of the State of Tennessee, the special supreme court, which heard the case which ended in a result unsatisfactory to him, and the Court of Appeals for the Western Section of the State of Tennessee because the result there did not suit his client, Mr. Inman. He has additionally impugned the integrity of a distinguished retired member of the Middle Section of the Court of Appeals of Tennessee. Based upon his past history of being unable to accept the proposition that political party squabbles over the nominating process are to be resolved in Tennessee within the party structure and not in the courts, we recognize the likelihood that the motives of this court will likewise be questioned by counsel for plaintiffs at some future time in some forum. This is indeed unfortunate—not for any personal harm done to any jurist—but because it substitutes passion for reason and serves to undermine and to weaken the foundation upon which our judicial system is based.

In truth and fact, there was no reasonable legal basis for this suit to be filed or the appeal to be taken. Because of the filing of this suit and this appeal the state has been put to considerable extra expense, another special supreme court has been required to be constituted, and many man hours have been needlessly expended by all parties involved in the process. Not only was there no reasonable basis for the lawsuit, the defamatory statements made in the pleadings and the briefs as to members of the judiciary are the most scandalous, improper and impertinent seen in the experience in the legal profession of the members of this court.

In *Ward v. Univ. of the South*, 209 Tenn. 412, 354 S.W.2d 246 (1962), one of the counsel in his brief asserted that certain proof in the record "gives the lie to the Trial Judge's conclusion that 'The University was not acquainted with all the circumstances.'" *Id.* 354 S.W.2d at 248.

In commenting and acting upon the above, the supreme court said:

Considered in the light of the foregoing authorities defining the word lie, and as the word is commonly used, there is not the slightest excuse for counsel's scandalous and impertinent assertion. It is not only an unwarranted defamatory imputation upon the integrity of one of the most able, conscientious and impartial trial judges in the State, but the flagrant violation of all the rules of professional propriety which govern the conduct of reputable members of the bar in their relations to the courts of which they are officers and in which they are allowed to practice.

While it is entirely proper for the counsel in his brief to show errors, and apply the law to them, he is not permitted to insert matters which are defamatory, scandalous, impertinent and untrue. Nor will the courts tolerate, either orally or by brief, their use as a vehicle for abuse of the trial judge, or as a forum for an unsuccessful attorney to vent his spite.

5 C.J.S., Appeal & Error sec. 1327, p. 346, 347, clearly states the law bearing on this sort of offense, supported by an abundance of authority, as follows:

"A brief in no case can be used as a vehicle for the conveyance of hatred, contempt, insult, disrespect or professional discourtesy of any nature for the court of review, trial judge, or opposing counsel; invectives are not argument, and have no place in legal discussion, but tend only to produce prejudice and discord.

"The practice of inserting in briefs language which tends to bring ridicule on the trial judge or jury or which impugns his or their motives and conduct, is considered a very reprehensible one and deserving of the strongest censure, and statements objectionable in this regard will not be considered. The penalty therefor seems to depend in a measure on the degree of the offense; in a number of cases the reviewing court has seemed to consider it sufficient to reprimand counsel and sound a note of warning against any further repetition of his misconduct." Sec. 1327, pp. 346, 347.

Counsel, in the instant case, has exercised the practice of law in this state for several years, and by now should be well informed of the rules and standards required of a licensed attorney. Many of these rules and standards are defined in the Canons of Professional Ethics which, by Rule 38, have been incorporated in the Rules of this Court. 185 Tenn. 889. In making the unwarranted assertion in his brief, counsel obviously chose to ignore and violate these rules. In doing so, his misconduct was highly reprehensible, and he deserves to be and is reprimanded; and he is warned that any further repetitions of misconduct will not be tolerated. *Id.* 354 S.W.2d at 249.

The situation here is not unlike that in *Ward v. Univ. of the South, supra.* We shall have no more of this. This court invokes its inherent equity power. Counsel for plaintiffs is forthwith restrained and enjoined in the future from in any way participating, directly or indirectly, alone or in concert with others, as counsel or party, in the filing of any other suit in any court of the State of Tennessee seeking to test the legality of the existing Supreme Court of the State of Tennessee based on any alleged improper action by the Democratic Party State Executive Committee in 1974 or any other fault with the nomination process as to the duly elected and *de jure* supreme court. *See Stewart v. Wakefield*, 536 S.W.2d 327 (Tenn.1976), where the supreme court enjoined the filing by "appellants, and all persons acting in concert or privity with them" of "any further litigation in the courts of this state questioning or attempting to challenge the validity of the bond issue here in question. . . ." This court expressly remands this matter to the Chancery Court of Davidson County, Tennessee, for the sole purpose of enforcing, if necessary, the mandates of the injunctive relief decreed herein.

Further, this court issues to counsel for plaintiffs the sternest of warnings that any future or additional scandalous, impertinent, improper and demeaning allegations or invectives made by him against the existing supreme court or any other court will

no longer be ignored or tolerated. This is a system of "laws, not of men" as correctly pointed out by counsel for plaintiffs in his brief, but in the wrong context. There is no place in this, or any other judicial system, for the type of disregard and disrespect for the judiciary repeatedly displayed by said counsel.

At this time this court will not award damages for a frivolous appeal pursuant to T.C.A. § 27–124 as it is not the sense and will of this court to monetarily punish either the plaintiffs or their counsel. However, it is the sense and will of this court that these seemingly endless and clearly improper efforts by counsel for plaintiffs to overturn previous well documented and proper rulings of this and other courts and to cast aspersions thereon will no longer be tolerated.

The decision of the learned chancellor is affirmed and the case remanded for the limited purpose of enforcing the injunction, if necessary. The costs are taxed to the plaintiffs.

E. BRUCE FOSTER, Jr., WALKER T. TIPTON, and A. C. WHARTON, Special Justices, concur.

JOYCE M. WARD, Special Justice, by separate opinion, concurs in part and dissents in part.

JOYCE M. WARD, Special Justice, concurring in part and dissenting in part.

I, regret that I am unable to concur entirely in the majority opinion. In my judgment, issues are discussed unnecessary to the disposition of this case. I would affirm the Chancellor's holding based solely on the lack of jurisdiction of the subject matter as held in *Taylor, supra.*

I dissent with the publication of the actions of counsel for plaintiffs. I believe the basis for the reprimand, which I consider necessary, should be briefly summarized,

without specificity in the opinion rather than republished in detail. I would refer the case record to the disciplinary board for appropriate action.

I would hold that this appeal is frivolous based upon the record in the face of *Taylor, supra,* and the history preceding the instant appeal. However, I dissent with the issuance of an injunction against counsel for the plaintiffs. I would tax all unnecessary costs, including costs of impaneling a special supreme court, to plaintiff Bench and Bar, and the officers and directors of Bench and Bar individually, pursuant to T.C.A. § 27–1–122.[1]

LEWIS H. CONNER, Jr., Special Chief Justice.

## DENIAL OF PETITION TO REHEAR

 Appellants have filed a petition to rehear in this cause alleging five grounds. None of these grounds is meritorious. None present matters not previously considered by the court. It is not necessary or appropriate to again specifically refute in detail each ground. Substantively and procedurally plaintiffs have no cause of action. It is the law of this state that contests of nominations for public office determined within the political party apparatus are not decided in the courts. *Taylor v. Tennessee State Democratic Executive Committee,* 574 S.W.2d 716 (Tenn.1978). There is no subject matter jurisdiction. The Supreme Court of Tennessee is *de jure.*

Counsel for appellants has likewise filed a motion to expunge that portion of the opinion headed "The Actions of Counsel for Plaintiffs." He complains that the court should not have referred to statements made by him in his *amicus curiae* brief lodged in the office of the clerk of the court two days prior to oral argument in this matter. His complaint is based upon his recollection that the court had determined

---

1. *Damages for frivolous appeal.*—When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award

just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

not to allow the filing of that brief. Counsel is in error regarding the ruling of this court on that question. We determine not to consider the *amicus curiae* brief in deciding upon the merits of the appeal because of its late submission and the fact that the principal subject matter of the brief had no relevancy or materiality to the issues before the court. However, as judicial officers of this state, even though limited in tenure, we could not ignore the offensive content of the *amicus curiae* brief as well as other writings of counsel on file in this cause. The court has taken judicial notice of the invectives of counsel and under the clear authority of *Ward v. Univ. of the South*, 209 Tenn. 412, 354 S.W.2d 246 (1962), it has dealt with them in what it deems an entirely appropriate manner.

The further contention of counsel that the opinion should be expunged because of lack of due process is equally without merit. There was no life, liberty or property deprived counsel by the holding of this court.

Following the precedent of *Stewart v. Wakefield*, 536 S.W.2d 327 (Tenn.1976), we did enjoin future participation by counsel in any additional court proceeding challenging the legality of the existing supreme court based upon the nominating procedure. We are satisfied that the injunction was both necessary and proper.

The petition for a rehearing is denied. The motion to expunge is likewise denied. The costs are taxed to the appellants.

E. BRUCE FOSTER, Jr., WALKER T. TIPTON, A. C. WHARTON, and JOYCE M. WARD, Special Justices, concur.