STATE of Rhode Island ex rel. Floyd
Edmund WEBB III

v.

Vincent A. CIANCI, Jr.

**In re Eligibility of Vincent A.
CIANCI, Jr.**

Nos. 90–555–M.P., 90–560–M.P.

Supreme Court of Rhode Island.

May 23, 1991.

Anthony J. Bucci, Jr., Frederick G. Cass, Steven E. Snow, Providence, for petitioner.

Patrick T. Conley, Ronald W. DelSesto, William A. Dimitri, Jr., William J. McGair, Providence, for respondent.

Amy R. Tabor, Pawtucket, Deming E. Sherman, Providence, Amicus Curiae.

## OPINION

SHEA, Justice.

These matters are before the Supreme Court on two petitions, one a petition for the issuance of a writ of certiorari to review a decision of the Rhode Island State Board of Elections and the other on a petition for leave to file an information in the nature of quo warranto. The ultimate relief sought by both petitions is the preven-

tion of Vincent A. Cianci, Jr., as mayor-elect, from assuming the office of mayor of the city of Providence. We deny both petitions.

The court heard oral argument on behalf of petitioners and respondent and carefully examined the briefs submitted by the parties and by amicus curiae. Following conference thereon, we issued an order on December 20, 1990, denying both petitions. 583 A.2d 880. That order was issued prior to the release of this opinion because of the obvious need of the city of Providence for a resolution of the issues before this court prior to the January 9, 1991 date on which the mayor-elect was scheduled to be inaugurated into office. Our opinion follows.

The events that gave rise to these petitions are well known to the people of this state. On April 23, 1984, Vincent A. Cianci, Jr. (Cianci), who was then the mayor of the city of Providence, entered a plea of nolo contendere in the Superior Court, County of Providence to the felony charge of assault with a dangerous weapon. He was adjudged guilty of the charge and a sentence of five years at the Adult Correctional Institutions was imposed. That sentence was suspended and defendant was placed on five years probation. That probationary period extended until on or about April 23, 1989. Two days after the imposition of sentence, Cianci resigned from the office of mayor because of disqualification provisions in the Home Rule Charter of the city of Providence. The office of mayor was declared vacant, and a special election was called to elect a mayor for the unexpired term.

Cianci declared his intention to become a candidate for election to that unexpired term. A timely challenge was filed to his eligibility to be elected to that unexpired term. That challenge ultimately came before this court. We ruled that Cianci was prohibited from seeking election to serve as mayor for the unexpired term created by his forfeiture of the office. *Gelch v. State Board of Elections*, 482 A.2d 1204 (R.I. 1984). The ruling was based upon sections 202 and 206 of the Home Rule Charter of the city of Providence. In that opinion we

noted that "[w]e need not decide whether state law (in particular G.L.1956 (1981 Reenactment) § 13–6–2) prohibits Cianci from holding public office. * * * State law concerning respondent's right to be a candidate in a general election for a full new term is not at issue, and therefore we need not address it." 482 A.2d at 1211 n. 6.

On June 27, 1990, Cianci filed his declaration of candidacy for election as mayor of the city of Providence for the term beginning January 1991. On July 13, 1990, Cianci filed his nomination papers with the Board of Canvassers of the city of Providence (Board of Canvassers). July 16, 1990 was the final date under G.L.1956 (1988 Reenactment) § 17–14–13 for the filing of objections to Cianci's candidacy. No objections were filed.

Eventually three candidates qualified for a place on the ballot for the office of mayor of the city of Providence at the general election for state and local offices in November 1990. Cianci was declared to have received a plurality of the votes cast. On November 9, 1990, the State Board of Elections conducted a recount and determined that Cianci had in fact received a plurality of the votes cast. On that same day, an objection was filed with the Board of Canvassers to the certification of the vote. The Board of Canvassers held an emergency hearing on the objection on November 13, 1990. Sometime prior to the hearing on the objection, however, the original objectors withdrew their objection and were replaced by the Vileno petitioners in the matter before us, who filed their own objection. After a hearing on the objection, the certificate of election was issued to Cianci.

An appeal to the State Board of Elections was taken by objectors to the decision of the Board of Canvassers. The State Board of Elections allowed Cianci to intervene in the proceedings. It granted his motion to dismiss the appeal but retained jurisdiction over the matter in order to conduct an evidentiary hearing to create a record with respect to the newly adopted state constitutional provisions, which were expected to have bearing upon the issues that would be raised before this court.

In due course the petition for an information in the nature of a quo warranto to challenge Cianci's title to the office of mayor was filed in this court by Floyd Edmund Webb III (Webb). Later, the Vileno petitioners filed a petition for the issuance of a common-law writ of certiorari to review the decision of the State Board of Elections. These matters were consolidated for hearing before the court.

We shall first address Webb's request for leave to file an information in the nature of quo warranto (information). This common-law proceeding is used to challenge an individual's title to public office and to oust the individual from the public office if the title is not well founded. *Fargnoli v. Cianci*, 121 R.I. 153, 162, 397 A.2d 68, 73 (1979); *Andrews v. Stiles*, 99 R.I. 546, 547–48, 209 A.2d 210, 211 (1965); *State v. Kearn*, 17 R.I. 391, 396–97, 22 A. 1018, 1020 (1891); *State v. Lane*, 16 R.I. 620, 626, 18 A. 1035, 1037 (1889); *see also State v. Brown*, 5 R.I. 1, 11 (1857). The origins of the information are directly linked to the ancient writ of quo warranto. That was a high-prerogative civil writ of right in England, reserved for the use of the Crown to demand by what authority an individual presumed to hold public office. Annot. *Right of private person not claiming office to maintain quo warranto proceedings to test title to or existence of public office*, 51 A.L.R.2d 1306, 1309 (1957); 65 Am.Jur.2d, *Quo Warranto* § 2 (1972); 74 C.J.S. *Quo Warranto* § 1 (1951). The writ became obsolete in England before the Revolutionary War. The obsolescence was said to have resulted in part from the cumbersome nature of the proceeding. *Id.* The writ was later supplanted by the "information in the nature of quo warranto," which was criminal in nature. It was used not only to fine the usurper but also to remove the usurper from the public office in question. *Id.* These developments found legislative expression in the English Statute of Anne in 1711, 9 Anne, ch. 20, which, although not considered applicable to the United States, is viewed as the ancestral basis for the quo warranto statutes found in many American jurisdictions today. Annot. 51 A.L.R.2d at 1309.

That statute expressly recognized the pre-existence of the information in the nature of quo warranto. Further, the statute conferred jurisdiction upon the courts to employ an information only with respect to the public and political offices that were specifically enumerated in the statute's preamble. *Brooks v. State*, 26 Del. 1, 79 A. 790, 795 (1911). The information was used in all instances wherein the writ of quo warranto was previously maintained. In the absence of a statute, the information's application in this country has been limited to instances in which the writ of quo warranto would have been granted at common law in England. High, *Extraordinary Legal Remedies* at 552 (3d ed. 1896). The information in the nature of quo warranto has been recognized in this jurisdiction to perform the same functions as the writ of quo warranto, *see Brown*, 5 R.I. at 7, and also to have lost all its character as a criminal proceeding in everything but form. *See Kearn*, 17 R.I. at 401, 22 A. at 1020.

This court has entertained numerous petitions for leave to file an information in the nature of quo warranto. In *Brown*, the court exercised its discretion to allow the Attorney General to file an information in vindication of a public right to challenge the title of the acting major-general of the Division of the Rhode Island Militia. After reaching the merits of the petition and deciding that the major-general improperly held the public office, the court ousted him and imposed a nominal fine. *Brown*, 5 R.I. at 11. Later, in *Attorney General v. McCaughey*, 21 R.I. 341, 43 A. 646 (1899), this court again exercised its discretion to allow the Attorney General to file an information in vindication of a public right to challenge the title of several Pawtucket highway commissioners appointed by the local Board of Aldermen. In that case, however, the court ruled that the highway commissioners were not "public officers" and therefore declined to reach the merits of the petition because quo warranto was an improper method by which to seek the commissioners' ouster. *Id.* at 348, 43 A. at 649.

■ These early decisions demonstrate that we have continuously exercised our discretion to hold that an information in the nature of quo warranto that seeks to vindicate a *public right* cannot be brought in this jurisdiction without the intervention of the Attorney General.[1] *Violet v. Voccola,* 497 A.2d 709, 710–11 (R.I.1985); *Black v. Cummings,* 62 R.I. 361, 367, 5 A.2d 858, 861 (1939); *Ney v. Whiteley,* 26 R.I. 464, 467, 59 A. 400, 401 (1904); *see also O'Brien v. Board of Aldermen of Pawtucket,* 18 R.I. 113, 116–17, 25 A. 914, 915 (1892). In complete agreement is *Fargnoli,* wherein we held that "title to public office should not be put in question any time an individual sees fit to cast a cloud. Proceedings by way of quo warranto or informations in the nature of quo warranto must be placed in public and responsible hands. The moving party on such occasions is the attorney general." 121 R.I. at 164 n. 6, 397 A.2d at 74 n. 6. The purpose of this rule is to protect public officials from numerous private challenges to their titles as public officers. The rule is followed by numerous jurisdictions that have considered the issue. *Newman v. United States ex rel. Frizzell,* 238 U.S. 537, 35 S.Ct. 881, 59 L.Ed. 1446 (1915); *Crouch v. City of Tucson,* 145 Ariz. 65, 699 P.2d 1296 (1984); *International Ass'n. of Firefighters v. City of Oakland,* 174 Cal.App.3d 687, 220 Cal.Rptr. 256 (1985); *Butterworth v. Espey,* 523 So.2d 1278 (Fla.Dist.Ct.App.1988); *State ex rel. Antrim v. Reardon,* 161 Ind. 249, 68 N.E. 169 (1903); *State of Maine v. Elwell,* 156 Me. 193, 163 A.2d 342 (1960); *State ex rel. Burk v. Thuet,* 230 Minn. 365, 41 N.W.2d 585 (1950); *Meehan v. Bachelder,* 73 N.H. 113, 59 A. 620 (1904); *State ex rel. Inman v. Brock,* 622 S.W.2d 36 (Tenn.1981).

■ Applying this rule to Webb's petition, we find it clear that he is seeking to vindicate a public right on behalf of all the citizens of Providence without the intervention of the Attorney General by challenging Cianci's title to the office of mayor. The petitioner's brief, in fact, urges that he "be granted standing to assert the *public's right* to an adjudication of the issues raised herein" and states that "[t]he [petitioner] * * * [is] prepared and qualified to adequately and fairly protect the *interests of the public* in this proceeding." (Emphasis added.) Therefore, we conclude that we are constrained by precedent to deny petitioner leave to file an information in the nature of quo warranto. In doing so, we are following the long-established doctrine set forth in the earlier decisions of this court.

We acknowledge that this court has from time to time exercised its discretion to allow private citizens to challenge an individual's title to public office without the intervention of the Attorney General. A review of these decisions reveals, however, that these private challenges have been allowed only in cases in which the proceedings were brought as petitions in equity in the nature of quo warranto (petition in equity). More importantly, in those cases the petitioners sought to place *themselves* in the public office in dispute. *Andrews v. Stiles,* 99 R.I. 546, 209 A.2d 210 (1965); *Gorham v. Robinson,* 57 R.I. 1, 186 A. 832 (1936); *McGroarty v. Ferretti,* 56 R.I. 152, 184 A. 508 (1936); *Horton v. Sullivan,* 35 R.I. 242, 86 A. 314 (1913); *Hoxsie v. Edwards,* 24 R.I. 338, 53 A. 128 (1902); *see also Black,* 62 R.I. at 364, 5 A.2d at 859.

■ In *Black,* we reasoned that a petition in equity could be brought only when it is claimed that the *petitioner* is entitled to the public office in dispute. In this regard the court stated:

"In a *proper case* there can also be no question of the jurisdiction of this court to entertain, in its discretion, a *petition in equity in the nature of quo warranto* brought by a private person in his own name and without the intervention of the

---

1. We disagree with relator's reliance on dicta in *Ney v. Whiteley,* 26 R.I. 464, 59 A. 400 (1904), for the proposition that a formal request for intervention by the Attorney General satisfies the condition precedent necessary to allow a private citizen to vindicate a public right. Our subsequent decisions clarify that we will not exercise our discretion to allow proceedings to vindicate a public right to be brought without the intervention of the Attorney General, and we affirm the continuing vitality of this well-founded rule.

attorney general." (Emphasis added.) *Black*, 62 R.I. at 364, 5 A.2d at 859. A petition in equity is a purely statutory proceeding that was first authorized in an 1891 statute.[2] *Fargnoli*, 121 R.I. at 162, 397 A.2d at 73. Although the Superior Court has jurisdiction to hear any proceeding upon a writ of quo warranto or by way of an information in the nature of quo warranto by virtue of G.L.1956 (1985 Reenactment) § 8–2–16, the Supreme Court has exclusive jurisdiction under § 10–14–1 to entertain petitions in equity in the nature of quo warranto. Such a petition in equity rests on an entirely different basis from petitioner's common-law petition for leave to file an information in the nature of quo warranto. And although the petition before us does not conform to the provisions of § 10–14–1, we shall nevertheless exercise our exclusive jurisdiction and examine the petition as if brought in equity to determine whether this is a proper case wherein this court could exercise its discretion to allow petitioner to challenge Cianci without the intervention of the Attorney General.

■ The petitioner argues that the matter before us constitutes a proper case because it raises important state constitutional issues and lacks any factual dispute. In doing so, he misinterprets the criteria we have used in prior decisions as a basis for determining what constitutes a proper case. In *Hoxsie*, this court exercised its discretion to allow a private citizen to petition in equity without the intervention of the Attorney General to challenge an individual's title to the office of town clerk of the town of Exeter. The petitioner alleged that he was the duly elected town clerk pursuant to a valid election. The challenged individual was the prior town clerk, who defended his title on the grounds that the petitioner's election was null and void and that he continued to hold the public office until his successor was duly elected and qualified. On the merits, the court concluded that the contested June 3, 1902 election was valid and therefore ousted the town clerk and replaced him with the petitioner. *Hoxsie*, 24 R.I. at 350, 53 A. at 132.

Similarly, in *McGroarty*, this court exercised its discretion to allow a private citizen to bring a petition in equity without the intervention of the Attorney General to challenge an individual's title to the office of city auditor of the city of Warwick. The petitioner argued that the acting city auditor was not properly appointed and asked the court to confirm him, the petitioner, as city auditor by reason of his right to remain in the public office until a successor was properly chosen or appointed. The court expressly found that the petitioner had a sufficient personal interest in the public office in dispute to allow him to bring the petition in equity without the intervention of the Attorney General. Nevertheless, on reaching the merits, the court found that the acting city auditor was properly appointed and therefore denied and dismissed the petition. *McGroarty*, 56 R.I. at 162, 184 A. at 512.

Later, in *Black*, this court exercised its discretion to deny private citizens leave to file a petition in equity without the intervention of the Attorney General to challenge the election of several individuals in the town of North Providence. The petitioners sought a new election. In a well-reasoned decision the court examined prior cases and offered this summation in regard to when a private citizen may petition in

---

**2.** At present, G.L.1956 (1985 Reenactment) chapter 14 of title 10 Quo Warranto provides in relevant part:

"10–14–1. *Equity petition in the Supreme Court.*—The title to any office, to determine which the writ of quo warranto lies at the common law, may be brought in question by petition to the supreme court.

"10–14–2. *Issues determinable in proceedings in nature of quo warranto—Parties.*—In any proceeding upon writ of quo warranto, or by information or by petition in the nature of

quo warranto, the court may determine the title of the relator or petitioner as well as that of the respondent; and in any such proceeding, all or any persons claiming the same office by whatever title, or claiming different offices depending upon the same election or appointment, may be made parties, and their respective rights may be ascertained and determined; and the court may consolidate for the purposes of healing [sic] and adjudication all such proceedings if brought separately."

equity without the intervention of the Attorney General:

> "Certainly the law in this state is clear that, where a petitioner seeks permission to file a petition in equity under the statute without the intervention of the attorney general, the primary issue must be the right of the petitioner to the office; and the petitioner in his petition must allege claim to it, and facts in support of his claim, or he will not be heard. In such a proceeding the petitioner can prevail only on the strength of his own title and not on the weakness of that of the respondent." *Black*, 62 R.I. at 372–73, 5 A.2d at 863.

The court ruled that since the petitioners made no claim to the public offices held by the challenged individuals, it would deny the petition and decline to reach its merits. *Id.* at 375, 5 A.2d at 863–64.

These decisions demonstrate our well-established rule under which the justices of this court over the years have exercised their discretion to allow a private citizen to petition in equity without the intervention of the Attorney General only in instances wherein the petitioner seeks to vindicate a *private right* by claiming title to the public office in dispute. *See Andrews v. Stiles*, 99 R.I. 546, 209 A.2d 210 (1965); *Gorham v. Robinson*, 57 R.I. 1, 186 A. 832 (1936); *McGroarty v. Ferretti*, 56 R.I. 152, 184 A. 508 (1936); *Horton v. Sullivan*, 35 R.I. 242, 86 A. 314 (1913); *Hoxsie v. Edwards*, 24 R.I. 338, 53 A. 128 (1902). That rule has been consistently applied by this court since the enactment of the 1891 statute authorizing the use of petitions in equity.

We must reiterate that the petition in equity to challenge Cianci's title to the office of mayor of the city of Providence without the intervention of the Attorney General seeks to vindicate a purely public right on behalf of the citizens of Providence. The petitioner makes no claim that he seeks to vindicate a private right on his own behalf by claiming title to the public office in dispute. Therefore, following long-established precedent, we conclude that this petition in equity must be denied.

■ We next address the Vileno petition for the issuance of a common-law-writ of certiorari that seeks our discretionary review of the State Board of Election's decision to certify Cianci as mayor-elect of the city of Providence. The petitioners filed an objection to Cianci's eligibility with the State Board of Elections after his apparent victory in the general election. The objection asserted Cianci was disqualified pursuant to article III, section 2, of the Rhode Island Constitution and G.L.1956 (1981 Reenactment) § 13–6–2. The Board of Canvassers held a hearing on petitioners' objections. Thereafter, the Board of Canvassers certified Cianci as the mayor-elect, and petitioners appealed to the State Board of Elections. On appeal the State Board of Elections asserted that it was without authority to rule on petitioners' objections to Cianci's eligibility because of petitioners' failure to file properly a timely objection in accordance with § 17–14–13. Thereafter, this petition for the issuance of a writ of certiorari was filed with this court to review the decision of the State Board of Elections.

The Vileno petitioners advance several reasons for us to exercise our discretion to issue a writ of certiorari. They advance as one reason the extreme public importance of their objections to Cianci's eligibility in that they claim that art. III, sec. 2, disqualifies Cianci. They also claim that the time limitations for objections set forth in § 17–14–13 are unconstitutional. The petitioners also suggest that a hearing on the merits may help to decide similar election disputes that are likely to arise in the future. Finally petitioners urge that the matter be heard on its merits in order to achieve a finality to the general election, thus dispelling any doubt concerning the lawfulness of Cianci's actions as mayor of the city of Providence.

In response Cianci claims that petitioners mistake the issue before us. He asserts that the only issue before us is the legal sufficiency of the procedure petitioners have chosen to challenge his eligibility. He argues that their failure to make their constitutional and statutory objections to his eligibility in accordance with § 17–14–13

requires that this court exercise its discretion to deny the petition for a writ of certiorari. We agree.

■ Section 17–14–13 provides in relevant part:

"*Objections to eligibility of candidate or sufficiency of papers.*—When nomination papers have been duly filed, and are in apparent conformity with § 17–14–11, they shall be conclusively presumed to be valid, unless written objections thereto are made as to the eligibility of the candidate or the sufficiency of the nomination papers or the signatures thereon. *All objections shall be filed in the office of the secretary of state or of the local board, as the case may be, by four o'clock (4:00) p.m. on the next business day after the last day fixed for filing nomination papers* in the appropriate office as heretofore provided." (Emphasis added.)

That statute is one of the many statutes enacted by the Legislature to establish and regulate an orderly electoral process in Rhode Island. Section 17–14–13 establishes the time and the place for the filing of all objections to the eligibility of candidates and the sufficiency of their nomination papers. The plain language of the statute mandates that all objections must be filed in either the office of the Secretary of State or the local board of canvassers by four o'clock in the afternoon on the next business day following the last day fixed for filing nomination papers. The obvious purpose of the statute is to ensure that objections to the eligibility of a candidate will be resolved before a candidate enters into a formal campaign.

The petitioners did not file their objections to Cianci's eligibility within the period established by the General Laws. The fact is that petitioners waited until after the general election and Cianci's apparent victory to file their objections. By the time the objections were filed, all the candidates had expended considerable effort, time, and resources in their quest for office, and the

community had gone through an entire election process without challenge, all contrary to the intent and purpose of § 17–14–13. The petitioners' failure to comply with § 17–14–13 is not excused by the candidate's filing his nomination papers almost at the last possible moment. It cannot be persuasively argued, as petitioners attempt, that the three-day span they had in which to file their objections renders § 17–14–13 unconstitutional because the statute fails to allow the public adequate time to object to the eligibility of a candidate. In this case all material facts relevant to the application of art. III, sec. 2, of the Rhode Island Constitution and § 13–6–2 to Cianci's eligibility were well known by petitioners and by the general public long before Cianci filed his nomination papers.

The substantive issues presented by petitioners are not dissimilar to those presented in *Gelch*, wherein we issued a writ of certiorari to hear a challenge to Cianci's eligibility to run in the 1984 special election in advance of the election date. In that case even though the challenge was timely filed, the time required for hearing the challenge by the State Board of Elections and the appeals process to this court necessitated our ordering a delay of the special election itself. Nevertheless, a decision on the challenge was possible before the election was held. Thus, while *Gelch* challenged Cianci's right to run under sections 202 and 206 of the Home Rule Charter of the city of Providence, the petitioner in that case, motivated by the same substantive issue as in this case, filed a *timely* petition for relief in accordance with § 17–16–16.[3]

■ We are also not persuaded by petitioners' argument that we should exercise our discretion to issue a writ of certiorari in order to achieve a finality to the general election, thus dispelling any doubt concerning the lawfulness of Cianci's actions as the mayor of the city of Providence. The principle in favor of finality of elections actually works against petitioners. In fact, the public policy supporting the finality of

---

**3.** General Laws 1956 (1988 Reenactment) § 17–16–16, now repealed, mandated that objections to the eligibility of a candidate must be filed within the same period prescribed by § 17–14–13, the relevant statute in the matter before us.

elections is entitled to very serious consideration when we are called upon to exercise our discretion to issue a writ of certiorari in election-related disputes. We elaborated on that public policy in *Van Daam v. Di-Prete,* 560 A.2d 953, 954 (R.I.1989), wherein we stated:

"The public policy of this state requires that challenges to qualification of candidates for public office be resolved as quickly as possible in order that an election may take place upon the dates previously ordained by the General Assembly. The state has a compelling interest in the validity and finality of the election of candidates to all public offices, but particularly to the office of chief executive. *Only prompt challenges presented in accordance with statutory and case law may be considered.*" (Emphasis added.)

It is ironic that petitioners present the finality of elections as a basis for their petition for relief when they could have raised the question of Cianci's eligibility well in advance of the general election by filing a timely objection in accordance with § 17-14-13.

■ The Vileno petitioners also assert as a reason for our issuing a writ of certiorari the absence of any other available remedy to review the decision of the State Board of Elections. In support, petitioners refer to G.L.1956 (1988 Reenactment) § 42-35-18, which specifically excludes a statutory appeal from decisions of the State Board of Elections, and our decision in *Van Daam,* wherein we stated that decisions of the State Board of Elections are "final and subject to review only by a petition for certiorari filed in this court." 560 A.2d at 954.

We acknowledge that petitioners' only remedy at this point is to petition for a writ of certiorari to this court. However, we cannot overlook the important fact that it was their own failure to make a timely challenge to Cianci's eligibility in accordance with the provisions of § 17-14-13 that put them in this predicament. It was that fact that led the State Board of Elections to decline to rule on their challenge to Cianci.

■ Although we have concluded that both the Webb and the Vileno petitions must be denied on procedural grounds, the issue concerning art. III, sec. 2, will probably arise in future elections. We believe, therefore, that its resolution now would be in the public interest.

Article III, section 2, provides:

"An elector shall be disqualified as a candidate for elective or appointive state or local office or from holding such office if such elector has been convicted of or plead nolo contendere to a felony or if such elector has been convicted or plead nolo contendere to a misdemeanor resulting in a jail sentence of six months or more, either suspended or to be served. Such elector shall not, once so convicted, attain or return to any office until three years after the date of completion of such sentence and of probation or parole."

Article III, section 2, of the amended Constitution clearly restores full civil rights to felons after the passage of three years following the completion of their sentence or period of probation. However, the effective-date provision of the article is ambiguous because it does not resolve the question before the court. That question is whether the article applies, as Cianci claims, only to convictions that occurred after the November 5, 1986 date on which ratification occurred. Or whether it applies, as petitioners assert, to all convictions and pleas, as long as the election itself takes place after November 5, 1986.

■ In construing constitutions, our task is to give effect to the intent of the framers. *See In re Opinion to the House of Representatives,* 45 R.I. 289, 120 A. 868 (1923). In doing so, it is appropriate for us to consult what extrinsic sources are available: not only the proceedings of the Constitutional Convention itself but also legislation relating to the constitutional provision in question adopted at the same time as the constitutional amendment or subsequently. *In re Opinion to the Governor,* 35 R.I. 166, 85 A. 1056 (1913); *see also*

*Gorham v. Robinson,* 57 R.I. 1, 186 A. 832 (1936).

When more than one construction of a constitutional provision is possible, "one of which would diminish or restrict a fundamental right of the people and the other of which would not do so, the latter must be adopted." *In re the Constitutional Convention,* 55 R.I. 56, 73, 178 A. 433, 441–42 (1935). Also it is well established that a constitutional provision is presumed to apply prospectively only, unless the intent to give it retroactive effect is clear either through explicit language or by necessary implication. *Nelson v. Ada,* 878 F.2d 277, 280 (9th Cir.1989); *see also Lawrence v. Anheuser–Busch, Inc.,* 523 A.2d 864, 869 (R.I.1987).

 In the transcript and exhibits compiled during the evidentiary hearing conducted by the State Board of Elections, we have been able to review parts of the journal of the Convention. We have also reviewed the testimony of the chairman and the eight members of the Committee on Ethics of the Constitutional Convention given during that evidentiary hearing.

All those witnesses were unanimous in their assertion that their intent was to draft a disqualification article that would have prospective application only. During committee meetings, on more than one occasion, reference was made to the status of Cianci and the status of another individual who had served a sentence in a federal prison during his term in office as a councilman in another community. Each time assurance was given that the proposed amendment would not disqualify the individuals from seeking office after its adoption.

The proposed resolution that later became art. III, sec. 2, was adopted by the Convention on March 18, 1985. On April 1, 1985, the Committee on Ethics again discussed the disqualification article. In order to make its intent about prospective application more specific, the Committee on Ethics adopted new wording for the effective-date provision of the resolution. The new language was as follows: "This resolution [art. III, sec. 2] shall take effect upon voter approval and shall apply to all persons convicted of crimes after such approval." That amendment to the resolution already passed by the Convention was placed on its calendar for consideration at its April 3, 1985 meeting. We understand that owing to procedural problems, the proposed amendment was never explained or debated by the full Convention. Testimony of the Committee on Ethics members indicated, however, that the failure to consider the amendment to the resolution in no way changed the fact that the Committee unanimously understood art. III, sec. 2, to be prospective in effect.

The petitioners argued that the failure of the Convention on April 3, 1985, to adopt the amendment to the proposed art. III, sec. 2, indicates a repudiation of the intent of the Committee on Ethics which authored the original resolution. We must reject that argument. There is no question that the amendment to the article already passed on by the Convention was offered only to make the Committee on Ethics's original intention concerning its application more specific. We believe it would be wrong to read anything into the failure to adopt the amendment because that amendment was never explained to or debated by the full Convention. The Convention's adoption of art. III, sec. 2, as originally proposed by the Committee on Ethics would indicate to us that the Convention never harbored any intent contrary to that of the Committee on Ethics when it first drafted and proposed art. III, sec. 2.

After the new Constitution was ratified by the voters, the General Assembly passed Public Law 1987, chapter 293, which, among other things, repealed § 13–6–2. That was the section of the General Laws that permanently barred from voting and from election to public office all persons on whom prison sentences of more than one year had been imposed. Under that section the only way such an individual could regain the right to vote or to run for elective office was by an act of the General Assembly. Section 13–6–2 provided:

"Every person who shall be sentenced to imprisonment in the adult correctional institutions for a term of more than one year, for any one (1) offense, shall forever thereafter be incapable of being elected to any office of honor, trust, or profit in this state and of acting as an elector therein, unless such person be expressly restored to such privilege by act of the general assembly."

In keeping with the amended constitutional provisions, § 13-6-2 was repealed as part of a package of remedial legislation enacted to bring the General Laws in to conformity with the revised Constitution. This package of bills was part of an overall scheme to reinstate the franchise to all felons at the expiration of a period of three years after their punishment was served.

The 1987 Act repealing § 13-6-2 also amended §§ 17-9-6, 17-14-1, and 8-15-8. In each instance the prior statutory provision had disqualified exfelons. The amendment in each instance provided for disqualification of persons convicted of a felony committed after November 5, 1986, only and whose sentence, including probation or parole, had not been completed at least three years before the person sought to vote or to declare candidacy for public office.

Each amendment brought the particular section of the General Laws in to conformity with art. III, sec. 2, in the revised Constitution. The explanation attached to the bill, prepared by the office of the Legislative Council for the information of the legislators who acted on Public Laws 1987, chapter 293, read:

"This act conforms election laws with respect to the registration and candidacies of convicted felons who have successfully completed their sentence, probation, etc., as required by the constitutional amendment adopted in 1986."

It is a well-settled principle of statutory construction that statutes relating to the same subject matter should be considered together so that they will harmonize with each other and be consistent. Such statutes are considered to be in pari materia even when they contain no reference to one another and even though they are passed at different times. *State v. Ahmadjian*, 438 A.2d 1070 (R.I.1981); *see also Herald Press, Inc. v. Norberg*, 122 R.I. 264, 405 A.2d 1171 (1979). There can be no question, then, that § 13-6-2 was repealed as part of a broad legislative effort to liberalize and extend voting rights and qualification for candidacy for elective office to convicted felons who had successfully served their sentences and completed their probations.

Nevertheless, petitioners take the position that § 13-6-2 remains in force and effect in regard to individuals who were convicted before that section was repealed. We cannot agree. To carry that argument to its logical conclusion would mean that a person convicted of a relatively minor felony before November 5, 1986, for which a very minor sentence was imposed, would remain permanently disenfranchised. And at the same time a person convicted of a more serious felony committed after November 5, 1986, would have his or her right to vote and to run for office reinstated automatically three years after completion of his or her sentence. Such a result would be unreasonable.

Even without the benefit of the Convention proceedings and deliberations we would reach the same conclusion about the applicability of art. III, sec. 2, by applying the usual rules for the interpretation of statutes and constitutions generally. All constitutional provisions are presumed to apply prospectively. They should be given retroactive effect only if such an intent is clear or if the subject matter permits no other construction. *Nelson v. Ada*, 878 F.2d 277 (9th Cir.1989). "If [a] statute [or constitutional provision] is remedial or procedural, that is, if it 'neither enlarges nor impairs substantive rights but prescribes the methods and procedures for enforcing such rights' * * * it may be construed to apply retroactively." *Lawrence*, 523 A.2d at 869 (quoting *Norton v. Paolino*, 113 R.I. 728, 733, 327 A.2d 275, 278 (1974)). "If [a statute or constitutional provision] creates, defines, or regulates substantive legal rights, it must be construed to operate

prospectively." *Lawrence*, 523 A.2d at 869; *Narragansett Electric Co. v. Burke*, 122 R.I. 13, 25, 404 A.2d 821, 828 (1979), *cert. denied*, 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980).

The petitioners Webb and Vileno argue that the application of art. III, sec. 2, to disqualify Cianci based on what occurred before it was adopted would not be a retroactive application because they view it as a prospective application of art. III, sec. 2, to "elections which occur after adoption of the article not to persons in Mr. Cianci's situation." We must reject that argument primarily because of the language used in the article, "an *elector* shall be disqualified * * *." The article very specifically disqualifies "persons" who have committed felonies. Since the disqualification occurs as a result of acts committed before the effective date of art. III, sec. 2, there can be no question that its application to Cianci would be a retroactive application.

It is a basic tenet of statutory construction that the Legislature will not be presumed to have intended to enact laws that are absurd, unjust, or unreasonable. *Coletta v. State*, 106 R.I. 764, 263 A.2d 681 (1970); *Wilkinson v. Harrington*, 104 R.I. 224, 243 A.2d 745 (1968); *Deignan v. Cowan Plastic Products Corp.*, 99 R.I. 193, 206 A.2d 534, (1965). To continue to disenfranchise a person who has been a law-abiding citizen for many years while extending the right to vote and to hold office to persons whose criminal offenses are more recent and more serious would in our opinion be absurd, unjust, and unreasonable. We must reject petitioners' argument on this issue and we hold that the repeal of § 13–6–2 applies equally to all former criminal offenders.

■■■ Furthermore it is highly doubtful that § 13–6–2 applied to Cianci at all. Although we have not had occasion to address directly the issue of whether § 13–6–2 applied to persons on whom suspended sentences were imposed, we have in other contexts ruled that § 13–6–2 required actual imprisonment to be applicable. In *State v. Rezendes*, 105 R.I. 483, 488, 253 A.2d 233, 235 (1969), we held that § 13–6–2

provides "that any person who is *imprisoned* for more than a year at the Adult Correctional Institutions for any offense shall be incapable of being elected to any office of honor, trust and profit and shall be unable to vote unless these privileges are expressly restored to him by act of the general assembly." (Emphasis added.) In *Bogosian v. Vaccaro*, 422 A.2d 1253, 1254 n. 1 (R.I.1980), we noted that we interpreted § 13–6–2 as applying to "any felon who is *imprisoned* at the Adult Correctional Institutions." In *Bailey v. Baronian*, 120 R.I. 389, 394 A.2d 1338 (1978), this court, after a thorough examination of our recent and earlier constitutional provisions and those of sister states, said the following:

"Thus, we hold that persons otherwise qualified to vote who are convicted of felonies and *have served time in prison* in this or any jurisdiction (federal or state) are disqualified from voting by reason of Amendment XXXVIII of the Rhode Island Constitution, unless and until the General Assembly restores that right." (Emphasis added.) *Id.* at 401, 394 A.2d at 1344.

In his brief Cianci points out that these interpretations of § 13–6–2 are consistent with a ruling by the United States Court of Appeals, Second Circuit, which had occasion to construe identical language in a deportation statute in connection with an alien who had received a suspended sentence. Judge Learned Hand, writing for the court, stated:

"We are therefore * * * considering whether the relator was 'sentenced to imprisonment for a term of one year or more.'

Formally indeed he was; the sentence so read. Actually he never was, because he was not to be imprisoned unless he defaulted in the [conditions of his suspended sentence]. The sentence was absolute; the imprisonment was conditional.

Therefore, unless we are to close our eyes to the substance and go merely on form, a sentence whose execution is conditionally suspended is not a sentence to imprisonment at all; it is no more than a

device to compel the offender to a course of conduct deemed desirable." *United States ex rel. Robinson v. Day*, 51 F.2d 1022, 1023 (2nd Cir.1931).

We conclude that even without the adoption of art. III, sec. 2, it would be our opinion that Cianci was not barred by the provisions of § 13–6–2 from running for election to the office of mayor of the city of Providence in November 1990.

In light of the Chief Justice's dissenting opinion, we believe it would be well to remind ourselves of the thoughts expressed by the great jurist Oliver Wendell Holmes in his dissenting opinion in *Northern Securities Co. v. United States*, 193 U.S. 197, 400–01, 24 S.Ct. 436, 468, 48 L.Ed. 679, 726 (1904).

"Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend."

The "great case" now before the court should not be allowed to persuade us to abandon the well-established principle that has guided our discretion that the Attorney General—and only the Attorney General—is empowered to file an information in the nature of quo warranto. The language quoted in the dissenting opinion from *Black v. Cummings*, ignores the holding in that case. The holding was:

"It is indisputable, therefore, that a proceeding in the nature of *quo warranto* to enforce a public right cannot be brought in this state without the intervention of the attorney general." 62 R.I. at 367, 5 A.2d at 861.

We also feel that the attempt in the dissent to distinguish several of the cases we have cited as authority does not survive

analysis.[4] We continue to believe the holdings in those cases support the conclusions of the majority.

Furthermore, it is unfortunate that the dissenting opinion ignores the repeated holdings of this court that § 13–6–2 was applicable only to persons actually imprisoned. *Bogosian v. Vaccaro*, 422 A.2d 1253 (R.I.1980); *Bailey v. Baronian*, 120 R.I. 389, 394 A.2d 1338 (1978); *State v. Rezendes*, 105 R.I. 483, 253 A.2d 233 (1969). The majority feels strongly that the court must not depart from settled principles of statutory and constitutional construction in order to achieve the disqualification from public office of a particular person, no matter how much notoriety may surround that person or the litigation involving him.

For these reasons the petition for leave to file an information in the nature of quo warranto is denied, the petition for certiorari is denied, the writ previously issued is quashed, the decision of the State Board of Elections is affirmed, and the papers of the case are remanded to the State Board of Elections with our decision endorsed thereon.

FAY, Chief Justice, dissenting.

For the reasons stated below I respectfully disagree with the majority. It is my firm conviction not only that this court has the discretion to grant the standing of the petitioners, Floyd Edmund Webb III (Webb) and Joseph Vileno, Jr., et al. (Vileno), to bring this appeal but that such discretion should have been exercised. The majority has fallen into grievous error by rigidly applying inapposite precedents to the unique factual circumstances of the case at bar. I shall demonstrate that a careful reading of constitutional provisions, statutes, prior Rhode Island cases, and persuasive precedents from other jurisdictions would lead inexorably to an opposite result.

Initially I turn my attention to the question of standing. Webb does not seek the office of mayor for himself, nor does he allege any entitlement to it. Webb sought

4. Those cases are *International Ass'n. of Fire Fighters v. City of Oakland,* 174 Cal.App.3d 687, 220 Cal.Rptr. 256 (1985); *State ex rel. Burk v.* *Thuet,* 230 Minn. 365, 41 N.W.2d 585 (1950); *State ex rel. Inman v. Brock,* 622 S.W.2d 36 (Tenn.1981).

leave to file an information in the nature of quo warranto in an attempt to block the then-mayor-elect Cianci from assuming the office of mayor of the city of Providence. Prior to Webb's request before this court, he had requested the Attorney General of Rhode Island either to file the information himself or to authorize Webb to initiate the proceedings in the name of the Attorney General. Both requests were refused.

In the past this court has defined several different types of quo warranto proceedings. *See Fargnoli v. Cianci*, 121 R.I. 153, 161, 397 A.2d 68, 72 (1979). The three various quo warranto actions are as follows: quo warranto writs, informations in the nature of quo warranto, and petitions in equity in the nature of quo warranto. *Id.* at 160, 397 A.2d at 72. The quo warranto writ and the information in the nature of quo warranto direct "an individual to show by what warrant he holds public office and to oust him from its enjoyment if the claim is not well founded." *Id.* at 161, 397 A.2d at 72. The writ of quo warranto has essentially been abandoned and replaced by the information in the nature of quo warranto. *Id.* In any event the writ and the information in the nature of quo warranto perform the same function. *Id.* A petition in equity in the nature of quo warranto, however, "not only ousts the respondent from office but also declares that the petitioner is the rightful holder of the office in dispute." *Id.* at 162, 397 A.2d at 73.

When we apply these distinguishing features to the case at hand, it becomes clear that Webb could not have proceeded by way of a petition in equity in the nature of quo warranto because he was not claiming a right to, nor was he entitled to, the office of mayor. The only means available to Webb to challenge the right of Cianci to sit as mayor of the city of Providence, therefore, was by way of an information in the nature of quo warranto. According to the majority of this court, however, such an information can only be brought by the Attorney General and cannot be brought by a private party. Because the Attorney General has, for whatever reason, refused to bring an information, Webb is without

redress in this court or in any other court in this state. I cannot agree with such a result. I believe not only that it was well within the discretionary powers of this court to grant Webb leave to file an information in the nature of quo warranto but that such leave should have been granted.

I am aware of this court's past pronouncements regarding the standing of a private individual to file an information in the nature of quo warranto absent the intervention of the Attorney General. At the same time, however, I am equally cognizant of this court's prior statements regarding the discretionary nature of standing and our liberal application of this fundamental requirement. An examination of this court's past treatment of these issues compels me to disagree with the majority's opinion.

The majority cites a number of cases allegedly demonstrating "our well-established rule that an information in the nature of quo warranto which seeks to vindicate a *public right* cannot be brought in this jurisdiction without the intervention of the attorney general." The cases cited by the majority are as follows: *Violet v. Voccola*, 497 A.2d 709 (R.I.1985); *Fargnoli v. Cianci*, 121 R.I. 153, 397 A.2d 68 (1979); *Black v. Cummings*, 62 R.I. 361, 5 A.2d 858 (1939); *Ney v. Whiteley*, 26 R.I. 464, 59 A. 400 (1904) (per curiam); *O'Brien v. Board of Aldermen of Pawtucket*, 18 R.I. 113, 25 A. 914 (1892); *State v. Kearn*, 17 R.I. 391, 22 A. 1018 (1891) (per curiam); *State v. Lane*, 16 R.I. 620, 18 A. 1035 (1889); and *State v. Brown*, 5 R.I. 1 (1857). Because I believe that the particulars of each of the cited cases can be distinguished from the present facts, I shall address each one separately.

The *O'Brien* case is easily distinguished from the case before us. In *O'Brien* the petitioners did not seek leave to file an information in the nature of quo warranto, rather they sought a writ of mandamus. Both *Black* and *Fargnoli* involved petitions in equity and are for that reason distinguishable from the present facts. The remainder of the cited cases did involve informations in the nature of quo warranto.

Each case, however, contains elements significantly dissimilar to those we are now facing. In *Violet, Kearn, Lane,* and *Brown* the informations were all filed by the Attorney General. The courts in each of these cases were not faced with the question of what to do if the Attorney General refused to bring the information. Finally in *Ney* there was never any allegation that the Attorney General refused to file or was ever asked to file the information.

These cases, however distinguishable from the case at hand, are not totally without merit in helping resolve the issues before us. They are, in fact, supportive of the argument I proffer that this court could, in its discretion, grant leave to a private individual to file an information in the nature of quo warranto absent the intervention of the Attorney General despite the fact that the petitioner is asserting a "public right." In *Black* this court reiterated what we had previously set forth in *State v. Pawtuxet Turnpike Co.*, 8 R.I. 521, 523–24 (1867), that " '[a]n information in the nature of *quo warranto* cannot be filed by a private individual without leave, which the court may, at its discretion, either grant or refuse.' " *Black*, 62 R.I. at 366, 5 A.2d at 860. In addition, this court stated the following in *Brown:*

> "It is very true that in cases in which a private relator moves, as he may, to be permitted to use the name of the state for the purpose of inquiring by what warrant an individual holds and exercises a public office, the motion is subject to the regulated discretion of the court. The necessity, the policy, of making the inquiry, and even the position and motives of the relator in proposing it, are all matters considered by the court, in the exercise of their discretion in granting such a motion; since a court of justice will not allow the name of the state to be used, and its own time to be occupied, improperly or unnecessarily, or merely to feed the grudge of a relator who has no interest in the matter of inquiry, to the disturbance of the public peace. The discretion to allow in such a case the filing of an information of this character, is, as

we apprehend, all the discretion which courts of law can, with propriety, or do, exercise, and all that cases of authority justify. When the information is filed, all the discretionary power of the court is expended; and the issues of law or fact raised by the pleadings must be tried and decided, under the law, in the same manner, and with the same strictness, as in any other case, civil or criminal." *Brown*, 5 R.I. at 6.

This court has addressed the issue of standing a number of times in other contexts. In *Gelch v. State Board of Elections*, 482 A.2d 1204, 1207 (R.I.1984), we expressly stated that we would confer "standing liberally when matters of substantial public interest are involved." In addition, we have "on rare occasions, overlooked the question of standing and proceeded to determine the merits of a case because of substantial public interest in having a matter resolved." *Blackstone Valley Chamber of Commerce v. Public Utilities Commission*, 452 A.2d 931, 933 (R.I.1982). This court has said that "we shall exercise our discretion and waive * * * defects so that we can address * * * profoundly important substantive issues." *In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1319 (R.I.1986). Our exercise of discretion in such matters "is solely attributable to the constitutional and public importance of the question propounded to this court." *Id.* at 1320.

The question of whether the constitution disqualifies an individual from assuming the position of mayor of the capital city of this state is indeed a profoundly important issue and one of substantial public interest. I cannot conceive of a situation that involves a greater public interest or presents a more important constitutional issue than the one we are faced with in these petitions. I believe we should have exercised our discretion and allowed Webb leave to file the information.

Perhaps I would not take such exception to the majority's decision if the majority had at least recognized the discretionary power of this court to grant leave to Webb, despite the absence of the Attorney Gener-

al, and then simply refused to exercise this discretion. The majority, however, chose to ignore the discretionary power this court has and instead, through its holding, effectively abolished the discretionary ability this court has possessed for over a century to grant standing in such circumstances.

In this context I can imagine a number of unsettling scenarios; the most disturbing is one in which the Attorney General is the unqualified office holder. For example, an individual is elected to and subsequently assumes the office of Attorney General. Sometime thereafter a challenge is made regarding the individual's eligibility to serve in said office. Certainly the Attorney General in this hypothetical situation would not commence a quo warranto action against himself or herself. The Attorney General could then cite this majority's opinion in support of an argument that no one else could bring such an action. It should be clear, therefore, why it is so imperative that this court maintain its discretionary ability to grant private petitioners leave to file informations in the nature of quo warranto when the Attorney General refuses. I believe that Webb, as a resident and a qualified elector of the city of Providence was a proper individual to bring this action. I am not alone in asserting such a point of view.

In *Civil Service Commission v. Pekrul*, 41 Conn.Supp. 302, 308, 571 A.2d 715, 719 (1989), the court stated, "By established case law, [the petitioner] as a * * * taxpayer, has standing to bring the quo warranto action." In *State ex rel. City of Waterbury v. Martin*, 46 Conn. 479 (1878), cited as authority by the *Pekrul* court, the court stated that it was

"unnecessary to determine, or even consider, the question whether the city in its corporate capacity can sue for this writ; for [the petitioner] is a co-relator, alleging that he is a taxpayer in the city. As such he is interested in having the duties annexed to the several public offices recognized by the city charter performed by persons legally elected thereto, and is entitled upon this proceeding to a determination as to the right of the respondent to exercise the office which he has

assumed, although no other person now claims it." 46 Conn. at 482.

In the case of *Huff v. Anderson*, 212 Ga. 32, 33, 90 S.E.2d 329, 330 (1955), the court stated that "a citizen and taxpayer" has "the right to inquire into the right of the respondent to hold a public office." The court in *Martinez v. Martinez*, 545 So.2d 1338 (Fla.1989), noted that "[i]n quo warranto proceedings seeking the enforcement of a public right the people are the real party to the action and the person bringing suit 'need not show that he has any real or personal interest in it.'" *Id.* at 1339 (quoting *State ex rel. Pooser v. Wester*, 126 Fla. 49, 53, 170 So. 736, 737 (1936)). Additionally the court in *Goff v. Hunt*, 6 N.J. 600, 605, 80 A.2d 104, 106 (1951), wrote that "[a] taxpayer and inhabitant of the city or county subject to its municipal government is interested in the due selection of its officers and he is entitled to interpose by information in the nature of *quo warranto* when such officers have been illegally selected." For cases providing additional support of this view, see *Carleton v. Civil Service Commission of Bridgeport*, 10 Conn.App. 209, 216–17, 522 A.2d 825, 828 (1987) (taxpayer has standing to proceed in quo warranto); *Highsmith v. Clark*, 245 Ga. 158, 158, 264 S.E.2d 1, 1 (1980) (citizen and taxpayer has standing in quo warranto); *Kidd v. Nelson*, 213 Ga. 417, 417, 99 S.E.2d 123, 124 (1957) (citizen and taxpayer has standing in quo warranto); *Demoura v. Newark*, 74 N.J. Super. 49, 60, 180 A.2d 513, 519 (1962) (citizen has standing in quo warranto); and *State ex rel. Barlow v. Benfield*, 231 N.C. 663, 664, 58 S.E.2d 637, 637–38 (1950) (residents, qualified voters, and taxpayers have standing in quo warranto).

The reasons for allowing a private individual to file an information in the nature of quo warranto when the Attorney General refuses are persuasive. The *Highsmith* court, quoting from *Churchill v. Walker*, 68 Ga. 681, 684 (1882), posed the following questions:

"Are not resident citizens of a municipality interested in the offices through which the civil government of the city is

administered? Are they not interested in having such offices legally filled, honestly and impartially administered? These offices are created by law for the benefit and convenience of the citizens, and if any usurper should assume their duties, can redress be had only through a contestant claimant? We think not." *Highsmith*, 245 Ga. at 158, 264 S.E.2d at 1. Finally, the court in *Carleton* stated, "A taxpayer qualifies for standing because as such he is interested in having the duties annexed to the several public offices recognized by the city charter performed by persons legally elected or appointed thereto whether or not another person claims the office." *Carleton*, 10 Conn.App. at 216, 522 A.2d at 828. In addition, the *Carleton* court stated:

> "The legality of a public office is not determined or established by the temporary or permanent nature of the incumbent's appointment, and its legality is subject to challenge by quo warranto during the entire period of incumbency. Because of the public's interest in its government by legal public officers, there can be no waiver of quo warranto entitlement by inaction during the passage of time." *Id.* at 216–17, 522 A.2d at 828.

Because the people of Rhode Island, and more specifically the people of the city of Providence, are entitled to a government run by constitutionally qualified individuals, I believe that Webb should have been granted leave to file an information in the nature of quo warranto. Common sense dictates such a conclusion, the people of this state deserve such a result, and justice demands it.

I am aware that in some of the jurisdictions to which I have referred above, the right of private individuals to file informations in the nature of quo warranto is statutory.[1] The rationale I espouse, however, for allowing Webb's petition in this instance is analogous to the rationale behind the enactment of the statutes. If an individual is unqualified to hold public office,

that individual should be either removed or barred from taking office in the first place. Constitutional qualifications cannot be conferred upon an unqualified individual simply by gaining the plurality of votes in an election. I suggest that because this jurisdiction lacks a statutory provision allowing for private individuals to bring an information in the nature of quo warranto when the Attorney General refuses, then it is of utmost importance for this court to retain its essential discretionary power to grant standing.

I do not dispute the fact that jurisdictions have come to differing conclusions when faced with like situations. A review of some of the cases cited by the majority from other jurisdictions, however, yields some interesting results. In *State ex rel. Inman v. Brock*, 622 S.W.2d 36, 44 (Tenn.), *cert. denied*, 454 U.S. 941, 102 S.Ct. 477, 70 L.Ed.2d 249 (1981), the court stated the general rule "that a private citizen, as such, cannot maintain an action complaining of wrongful acts of public officials unless such private citizen avers special interest or a special injury not common to the public generally." The *Brock* court further stated, however, that an exception to this general rule is found in *Bennett v. Stutts*, 521 S.W.2d 575 (Tenn.1975). The court in *Stutts* stated as follows:

> "We recognize that the requirement that suits in the nature of a *quo warranto* and those seeking to redress public wrongs be brought by the District Attorney General can create insurmountable problems. Public spirited citizens should not be stifled or stopped in their search for solution to public wrongs and official misconduct. * * *
>
> "If the District Attorney General, in matters such as this, should act arbitrarily or capriciously or should be guilty of palpable abuse of his discretion in declining to bring such an action, or in authorizing its institution, the courts will take jurisdiction upon the relation of a

---

1. See generally Conn.Gen.Stat.Ann. chapter 918 of title 52 (West 1960); Fla.Stat.Ann. chapter 80 of title 6 (West 1987); Ga.Code Ann. article 4 of title 9 (1982); N.J.Stat.Ann. chapter 66 of title 2A (West 1976); N.C.Gen.Stat. article 41 of chapter 1 (1983).

private citizen, in the name of the State of Tennessee. * * *

"When citizens sue to rectify a public wrong, under these circumstances, a copy of the complaint shall be served upon the District Attorney General. It shall be the duty of the trial court forthwith to conduct an in limine hearing designed to determine whether to permit plaintiffs to proceed. If it be determined that the District Attorney General's refusal to bring the action, or to authorize the use of his name in its institution, was improper or unjustified, or that plaintiff's case is prima facie meritorious, the trial court shall permit the action to proceed." *Id.* at 577.

In *International Association of Fire Fighters v. City of Oakland,* 174 Cal. App.3d 687, 220 Cal.Rptr. 256 (1985), another case cited by the majority, the court stated:

"[I]t has also been held that in an exceptional case the court may in its own discretion authorize a private person to proceed notwithstanding the attorney general's refusal to institute proceedings or consent to their institution by another, and that under statute or rule of court the discretion of the attorney general is not arbitrary, but that on the contrary he is subject to the order of the court to file an information in the nature of quo warranto if the court deems such action in the public interest, and that on refusal of the attorney general to act a private citizen may bring such proceedings where essential to vindicate the public right." *Id.* at 698, 220 Cal.Rptr. at 263 (quoting 74 C.J.S. *Quo Warranto* § 18 (1952)).

Finally, in *State ex rel. Burk v. Thuet,* 230 Minn. 365, 41 N.W.2d 585 (1950), also cited by the majority, the court stated, "The general rule of law in this state is that a private citizen has no right, except under extraordinary or exceptional circumstances, to the use of quo warranto to test the title of an incumbent of a public office." *Id.* at 365–66, 41 N.W.2d at 586. I state once again that I cannot conceive of a situation in which this court has faced such

extraordinary or exceptional circumstances than those before us now.

I shall briefly address the issue brought out by the majority regarding Webb's inability to proceed by way of a petition in equity in the nature of quo warranto. I agree with the majority's pronouncement that Webb is not a proper individual to bring a petition in equity. As I stated earlier, such a petition seeks to place the petitioner in office while removing the respondent. Webb does not seek the office of mayor of Providence.

Although the majority speaks at length about Webb's inability to file a petition in equity, it fails to confront the question that naturally follows, which is, who could properly have brought such a petition in the instant case? Only three potential possibilities exist: Andrew Annaldo (Annaldo), Frederick Lippitt (Lippitt), and Joseph Paolino (Paolino).

I shall first look at Annaldo and Lippitt, the two candidates Cianci defeated in the November election. It is extremely questionable whether Annaldo, as a third-place finisher in a three-person race for mayor, could seriously argue that he is entitled to the office if Cianci were to be prohibited from assuming the position. It is equally questionable whether Lippitt could claim a right to the office of mayor because he only received approximately 33 percent of the total votes cast.

The final hypothetical involves Paolino, the mayor of Providence at the time of the election. Again the question must be asked, what right could Paolino assert to the office when he himself voluntarily forfeited the office by not seeking reelection and instead chose to seek the office of governor of this state? I suggest, therefore, that none of the above-mentioned individuals could have properly filed a petition in equity in the nature of quo warranto because not one of them could rightfully claim entitlement to the office of mayor upon Cianci's disqualification.

I now turn my attention to the Vileno petition and the majority's decision to deny the requested discretionary review of the decision of the State Board of Elections to

certify Cianci as the mayor-elect of the city of Providence. The majority's decision was premised upon the conclusion that the objection to Cianci's eligibility was made too late. This conclusion was grounded upon the language of G.L.1956 (1988 Reenactment) § 17–14–13, which states that "objections shall be filed in the office of the secretary of state or of the local board, as the case may be, by four o'clock (4:00) p.m. on the next business day after the last day fixed for filing nomination papers in the appropriate office."

I concur with the majority that the objection made by the Vileno petitioners came following the expiration of time set forth in § 17–14–13. I disagree, however, with the majority's conclusion that the belated filing of the objection bars the action altogether. I believe this court should have exercised its discretion and granted the relief the Vileno petitioners sought.

There is no question that "this court has exclusive jurisdiction to grant the writ of *certiorari.*" *White v. White,* 70 R.I. 48, 50, 36 A.2d 661, 663 (1944). In addition, the question "whether or not the writ shall issue is not a matter of right but rests in the discretion of the court." *Id.* This court has stated in the past that whereas "the Legislature may limit, restrict or deny a litigant access to this court, it cannot divest this court of power to review decisions of subordinate tribunals by way of the discretionary common-law certiorari." *Hester v. Timothy,* 108 R.I. 376, 383, 275 A.2d 637, 640 (1971); *see In re Caldarone,* 115 R.I. 316, 320, 345 A.2d 871, 873 (1975).

It is my opinion that because of the extraordinary nature of the issues involved herein, this court should have exercised its discretion and granted the relief the Vileno petitioners sought. In my treatment of the Webb petition, addressed previously in this opinion, I discuss at length the need for discretionary review in such extraordinary circumstances. In accordance with my aforementioned argument I simply cannot agree with the majority's position that because the Vileno petitioners failed to meet a deadline imposed by the Legislature, they are now without redress. Such a conclu-

sion makes no sense, especially when the result is that an individual who was allegedly disqualified by the constitution is allowed to remain in the office of mayor of the city of Providence free from challenge.

Although the majority concludes that petitioners lack standing to bring this action, they go on to address the merits of the case. I disagree with the majority's interpretation and application of both G.L.1956 (1981 Reenactment) § 13–6–2 and article III, section 2, of the Rhode Island Constitution concerning Cianci. In 1984, when Cianci received a five-year sentence for assault with a dangerous weapon, § 13–6–2 was the applicable statute regarding disqualifying electors and candidates for elections. The statute included the following provision:

"Every person who shall be sentenced to imprisonment in the adult correctional institutions for a term of more than one year, for any one (1) offense, shall forever thereafter be incapable of being elected to any office of honor, trust, or profit in this state and of acting as an elector therein, unless such person be expressly restored to such privilege by act of the general assembly."

Although the statute does not specifically refer to individuals who have received suspended sentences, it has been determined that one who receives a suspended sentence has indeed been sentenced. This court in *State v. Robalewski,* 96 R.I. 296, 300, 191 A.2d 148, 151 (1963) established that in accordance with G.L.1956 § 12–19–8, "A suspended sentence is one actually imposed but the execution thereof is thereafter suspended." Therefore, Cianci does fall within the scope of § 13–6–2. If § 13–6–2 is in fact the operative statute, Cianci is not qualified as a candidate for elective office absent a specific act by the General Assembly restoring other privileges.

Section 13–6–2 was subsequently repealed in its entirety by the General Assembly in 1987 by P.L.1987, ch. 293, § 5 of an act relating to elections. Pursuant to G.L.1956 (1988 Reenactment) § 43–3–22, the repeal of § 13–6–2 does not terminate

the applicability of § 13-6-2 regarding Cianci. Section 43-3-22 provides that "[t]he repeal of any statute shall in no case affect any act done, or any right accrued, acquired, or established, or any suit or proceeding had or commenced in any civil case before the time when the repeal shall take effect." Cianci therefore remains subject to the regulatory statute in effect at the time of sentencing and is not eligible as a candidate for election until the General Assembly passes a specific act granting him that privilege. It is only logical to view the repeal of § 13-6-2 in this manner.

Had repealing § 13-6-2 automatically restored the privileges, Cianci, as well as every other convicted felon who falls within the statute, whether currently serving a penal sentence or not, would be eligible to vote in elections as well as qualify as a candidate for elective office in the state. This clearly was not the intent of the General Assembly. In repealing § 13-6-2, the Legislature did not intend automatically to restore the privileges of "being elected to any office of honor, trust, or profit in this state and of acting as an elector" to all convicted felons. In fact the intent behind repealing the statute was clearly set forth in the Explanation by the Legislative Council of an Act Relating to Elections: "This act conforms the election laws with respect to the registration and candidacies of convicted felons who have successfully completed their sentence, probation, etc., as required by the constitutional amendment adopted in 1986. The act would take effect upon passage." It is clear from this explanation that the Legislature intended the constitutional amendment of 1986, pertaining to art. III, sec. 2, of the Rhode Island Constitution, effectively to replace the prohibitions imposed by § 13-6-2 regarding those persons convicted of felonies after the amendment took effect. Assuming arguendo that the Legislature's intent was to apply the constitutional amendment to those felons convicted prior to its enactment, Cianci's status as an unqualified candidate remains unchanged.

Article III, section 2, limits the class of eligible electoral candidates as follows:

"An elector shall be disqualified as a candidate for elective or appointive state or local office or from holding such office if such elector has been convicted of or plead nolo contendere to a felony or if such elector has been convicted or plead nolo contendere to a misdemeanor resulting in a jail sentence of six months or more, either suspended or to be served. Such elector shall not, once so convicted, attain or return to any office until three years after the date of completion of such sentence and of probation or parole."

The constitutional amendment was effective upon voter approval. The constitutional convention approved it on June 26, 1986, and the public voted in favor of the amendment on November 4, 1986.

That the amendment applies to all elections occurring subsequent to its enactment is not in dispute, nor is there any question that individuals sentenced subsequent to the approval of the amendment are bound by the three-year restriction. The controversy concerns the effect of the amendment on those individuals sentenced prior to the approval of the amendment who do not qualify as candidates for election pursuant to the three-year prohibition invoked by the amendment.

The plain language of the amendment prohibits convicted felons from presenting themselves as eligible to be candidates in any elections until three years have elapsed after the completion of their sentences. Many individuals fall into the class of persons sentenced prior to November 4, 1986, whose three years have not yet expired. Because the amendment applies specifically to individuals who receive "a jail sentence of six months or more, either suspended or to be served," the fact that Cianci's five-year sentence was suspended does not exclude him from the class of persons effected by the amendment. On April 24, 1984, Cianci received a five-year suspended sentence for assault with a dangerous weapon. Although Cianci's sentence expired on April 23, 1989, in accordance with the constitutional amendment he will not be eligible to offer himself as a candidate for election until April 23, 1992. That applica-

tion to Cianci does not create any constitutional difficulties. The application of art. III, sec. 2, to all future elections and inaugurations, including those involving persons who have prior felony convictions, is in fact a prospective application of the amendment. Consideration of an antecedent fact, such as a prior felony conviction, does not render the amendment retroactive.

In 1960 the United States Supreme Court considered the constitutionality of a New York statute that sought to disqualify anyone who had been convicted of a felony from holding office in any waterfront labor organization. The Court upheld the statute, reasoning that the application of the statute to individuals convicted of a felony prior to its effective date was proper. The Court went on to state that the statute was a necessary part of a "much needed scheme of regulation." *De Veau v. Braisted*, 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109, 1120 (1960). As I shall discuss in more detail when I reach my examination of the legislative intent regarding art. III, sec. 2, it was enacted as part of an effort by the Legislature to regulate the qualifications of those persons holding office in Rhode Island. Accordingly disqualification of Cianci pursuant to art. III, sec. 2, does not render the application of the amendment unconstitutional.

It has been established that it is not necessary to look beyond the plain language of a constitutional provision to establish its meaning; therefore, as stated above, on its face, art. III, sec. 2, applies to Cianci. *Gorham v. Robinson*, 57 R.I. 1, 31–34, 186 A. 832, 837–38 (1936). However, if the meaning of a constitutional amendment is called into question, it is possible to look beyond the surface of the provision to discern the intent of the drafters. *Gelch*, 482 A.2d at 1217; *Bailey v. Baronian*, 120 R.I. 389, 391, 394 A.2d 1338, 1339 (1978); *Gorham*, 57 R.I. at 31–34, 186 A. at 837–38. In a situation in which a term or a clause is challenged, "[w]e must look to the history of the time and examine the state of things existing when it was framed and adopted, to ascertain the old

law, the mischief and the remedy." *Bailey*, 120 R.I. at 391–92, 394 A.2d at 1339.

I agree with the majority that the intent of the drafters may be determined by examining the documentation compiled during the evidentiary hearing conducted by the board of elections concerning the resolution that became art. III, sec. 2. When we review the transcripts of the Report of the Ethics Committee on Qualifications for Office–Persons Convicted of Crimes, as well as the transcripts of proceedings at the constitutional convention pertaining to art. III, sec. 2, it is apparent that the amendment's effect on and its application to individuals convicted prior to the enactment of the amendment were considered. The ethics committee (committee) specifically addressed the potential of a problem's arising concerning individuals who had been previously convicted. They discussed inserting language into the amendment to limit the class of convicted individuals affected to those convicted subsequent to the approval of the amendment. The committee recognized that absent such qualifying language, the provision could be interpreted as including persons serving sentences at the time of the approval of the amendment. The changes were suggested and discussed; however, they were not introduced at the constitutional convention, and consequently they were never incorporated into the amendment. As approved, art. III, sec. 2, refers to all individuals convicted of crimes and sentenced to six months or more whose three years have not elapsed, regardless of when the felony conviction occurred. The suggested limitation was never implemented.

The majority, although stating that "we believe it would be wrong to read anything into the failure to adopt the amendment because that amendment was never explained to or debated by the full convention," clearly believes that the restrictive language does apply to the amendment in its final form and therefore does not apply to Cianci, who was convicted prior to the amendment's enactment. The majority argues that failing to consider the limiting language "in no way changed the fact that the committee unanimously understood art.

III, sec. 2, to be prospective in effect." In adopting this viewpoint, the majority is apparently purporting that because the language was initially adopted by the committee on ethics and no evidence of a direct challenge to said language exists, the constitutional amendment, as accepted and approved in its final form, should be read as incorporating the proposed restriction, even though no language can be found in the amendment supporting this premise. I strongly disagree. In concluding that a phrase that was obviously omitted from a constitutional amendment was merely a procedural oversight and was actually intended to be included in the amendment, the majority has gone beyond the bounds of reasonable inference. In contrast, I aver that failing to incorporate the provision into the final form of the amendment clearly reflects the intentions of the committee and the full convention not to adopt the language. Therefore, if art. III, sec. 2, is the effective provision, it does apply to Cianci as well as to all persons convicted prior to November 4, 1986, who fall within the class created by the amendment.

Additionally the transcripts reference the atmosphere surrounding the construction of the amendment, thereby further evidencing the motivation for the amendment and the intent of the drafters to include prior convicted individuals in the class affected by the provision. The amendment was a response to "Rhode Island's history and current political climate." It was intended to "send a message to the people of this state that this convention will not tolerate the low standard of politics and [business as] usual that we have in the state both in its past an[d] even now." The amendment was clearly intended to apply to convicted felons in situations similar to Cianci's. The committee's transcripts make reference to the amendment as the "Buddy Cianci bill." It was an attempt to restore "the confidence of the people of the state in their government" by means of establishing a "high qualification for holding of public office."

The amendment, in its final form, disqualifies any individual who "has been convicted or plead nolo contendere to a felony."

The constitutional convention, as well as the voters, approved this language. "Has been convicted" implies that all persons convicted prior to any election to which the amendment applies are governed by the qualifications set forth.

Since no man is completely above the law, if the amendment to art. III, sec. 2, does not apply to Cianci, the regulatory statute in effect at the time of Cianci's conviction must apply to him. It would appear that if we were to consider the enactment of art. III, sec. 2, and the subsequent repeal of § 13–6–2 to mean, as the majority suggests, that art. III, sec. 2, extinguishes any and all effect § 13–6–2 may have on those felons convicted prior to the repeal of § 13–6–2, such felons are now subject to the three-year statutory waiting period imposed by the amendment. As the issue was previously addressed in this dissent, pursuant to either interpretation, Cianci does not qualify as a candidate for the 1990 mayoral election. Therefore, by deeming Cianci eligible as a candidate, the majority has effectively determined that a class of felons exists to which no electoral restrictions apply. The class created includes all those individuals sentenced to the Adult Correctional Institutions for more than one year for any one offense prior to November 4, 1986. This interpretation of the effect of the constitutional amendment is, I suggest, not only contrary to the intent of the Legislature but manifestly unreasonable as well.

Finally the application of art. III, sec. 2, as applied to Cianci does not render it an ex post facto law prohibited by both the Constitution of the United States and the Rhode Island Constitution. This court has held that the following types of laws fall within the ex post facto prohibition:

"1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when

committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Lerner v. Gill*, 463 A.2d 1352, 1356 (R.I.1983) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 385, 390, 1 L.Ed. 648, 650 (1798)).

It is the third of the above categories that applies to the present controversy. Therefore, in order for art. III, sec. 2, to be violative pursuant to the above definition, it would have to be penal in nature. In the case at bar it is clear that art. III, sec. 2, was not enacted for the express purpose of punishing Cianci for past activities but rather was enacted to establish qualifications for and to promote public trust in public office. As such its application is a legitimate and appropriate exercise of the state's police power and therefore is constitutionally proper. *De Veau*, 363 U.S. at 160, 80 S.Ct. at 1155, 4 L.Ed.2d at 1120. Additionally the *Calder* court's third category requires that the change "inflicts a greater punishment than the law annexed to the crime, when committed." *Calder*, 3 U.S. (3 Dall.) at 390, 1 L.Ed. at 650. As previously discussed, this is not the situation in the present case. At the time Cianci was convicted and sentenced, he was subject to a lifetime disqualification from holding elective office pursuant to § 13–6–2. The constitutional amendment in question has the effect of reducing that lifetime incapacity to a mere three-year waiting period, an obvious abatement from the previous penalty.

In 1983 and again in 1987 this court engaged in an examination of the purposes to be served by the ex post facto clause. In 1983 we noted the reasons for the existence of the ex post facto clause as promulgated by the United States Supreme Court. "First, legislative acts should give fair warning of their effect and allow individuals to rely on their meaning until explicitly changed. Second, the ban on ex post facto laws is necessary to prevent lawmakers from abusing their power through arbitrary action." *Lerner*, 463 A.2d at 1357 (citing *Weaver v. Graham*, 450 U.S. 24, 28–29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17, 23 (1981)). We then went on to conclude, "These purposes should be remembered when considering whether a law is constitutional or not under the ex post facto clause. If these goals are not in some way enhanced, a court should be most reluctant to invoke the ex post facto prohibition." *Lerner*, 463 A.2d at 1357. In 1987 we went a step further and adopted an approach previously presented in a Harvard Law Review article to determine whether the unfairness characteristic was present in a given law.

"[I]t is * * * clear that the factor most often appearing in these cases is the extent to which the parties have laid reasonable reliance on the law existing at the time of the conduct whose legal consequences the retroactive statute would alter. The importance of this element is apparent when one considers that in very general terms the two major factors to be weighed in determining the validity of a retroactive statute are the strength of the public interest it serves and the unfairness created by its retroactive operation, and the reliance of the parties on preexisting law is perhaps the most accurate gauge of the latter." *Lawrence v. Anheuser–Busch, Inc.*, 523 A.2d 864, 870 (R.I.1987) (quoting Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv.L. Rev. 692, 727 (1960)).

There can be no doubt that the institution of qualifications for public office serves a substantial and rational public interest. The question then becomes whether Cianci relied upon the pre-existing law to such an extent to render the change, as applied to him, fundamentally unfair. Cianci, as a member of the Rhode Island bar, surely knew that his actions, which led to his conviction on April 23, 1984, constituted a felony. It is also reasonable to assume that as a lawyer Cianci knew the potential penalty for such an offense, the most lenient of which could have subjected him to § 13–6–2, providing for his lifetime disqualification from public office. It is illogical, therefore, to conclude that Cianci relied on

the law as it existed to guide his actions at that time. Accordingly art. III, sec. 2, as it applies to Cianci, is not an ex post facto law.

For the foregoing reasons I respectfully dissent from the majority opinion.

I now feel compelled to address the majority's response to this dissent. I too believe that this court should be mindful of the wise sentiments expressed by Justice Oliver Wendell Holmes. The practical application of Justice Holmes's wisdom to the facts of this case, however, is the point at which the majority and I part company. It is manifest that this court not be persuaded by the political ramifications of the "great case" before us in rendering a decision. This court should, however, always be "persuaded" by its own language and precedent. Accordingly, although the majority is correct that the ultimate holding in *Black v. Cummings* denies the *Black* petitioners the right to bring their petition, the majority apparently chooses to ignore the critical fact that the relief the *Black* petitioners sought was the granting of a petition *in equity* in the nature of quo warranto. As already discussed within this dissent, a petition in equity in the nature of quo warranto is markedly different from an information in the nature of quo warranto and is thus distinguishable. Furthermore, although the language relied upon by the majority does appear in *Black*, the following language also appears:

> " 'An information in the nature of quo warranto cannot be filed by a private individual without leave, which the court may, at its discretion, either grant or refuse.'
>
> "We have said enough to show that the petitioners are not entitled to a hearing on the merits as of right; and further, that they have not shown us by their petition or by the argument at the hearing that they present a case which should move us to exercise the discretion vested in the court by allowing a hearing on the merits." *Black*, 62 R.I. at 366, 375, 5 A.2d at 860, 864.

It would appear, therefore, that *Black* can be cited to stand for both propositions and thus provides no definitive answer to the question posed by these petitions.

For the reasons already stated, I believe that this court has the discretion to grant the petitions before us.